2023 IL App (1st) 220881

No. 1-22-0881

Opinion filed June 8, 2023

Fourth Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| *In re* | ) | |
| H.C., J.J., and Nor. B., | ) | Appeal from the |
|     Minors-Appellees, | ) | Circuit Court of |
| | ) | Cook County. |
| (The People of the State of Illinois, | ) | |
|     Petitioner-Appellee, | ) | Nos. 20JA330, 20JA331, and |
| | ) | 20JA333 |
|       v. | ) | |
| | ) | Honorable Tiesha Smith, |
| Anna L., | ) | Judge, presiding. |
|     Respondent-Appellant.) | ) | |

_____

PRESIDING JUSTICE LAMPKIN delivered the judgment of the court, with opinion.
Justices Hoffman and Martin concurred in the judgment and opinion.

**OPINION**

¶ 1     This appeal arises out of proceedings to adjudicate wardship of appellant-mother Anna L.'s

four children, H.C., J.J., Nor. B., and Nol. B. under the Juvenile Court Act of 1987 (Act) (705

ILCS 405/1-1 *et seq.* (West 2020)). On May 19, 2022, the trial court found that H.C., J.J., and Nor.

B.[1] were abused or neglected as defined by the Act and subsequently ordered that (1) H.C. and

_____

[1]Nol. B. died of natural causes on March 31, 2021.

Nor. B. be placed in the custody of the Department of Children and Family Services (DCFS) and (2) J.J. be placed in the custody of appellee-father, Kendrick J.

¶ 2    Our precedent instructs that a proceeding for adjudication of wardship "represents a significant intrusion into the sanctity of the family which should not be undertaken lightly." (Internal quotation marks omitted.) *In re Arthur H.*, 212 Ill. 2d 441, 463-64 (2004). The proceedings below did not live up to that command. Instead, the hearing that unfolded was one where discovery was not complete until appellant-mother was ready to begin her case-in-chief. Just prior to resting, the State acquired and sought to admit a staggering 18,603 pages of medical records, which included a prejudicial legal opinion from a medical doctor upon which the trial court relied heavily. Defense counsel's disconcerting acquiescence to this and failure to shield her client from highly damaging evidence constitutes the central and dispositive issue of this case. We are persuaded that, but for defense counsel's deficient performance, there was a reasonable probability that the outcome of this case would have been different. Accordingly, for the reasons that follow, we reverse and remand for a new hearing.[2]

¶ 3                                    I. BACKGROUND

¶ 4                                  A. Procedural History

¶ 5    At the time proceedings were initiated in this case on February 21, 2020, appellant-mother was 32 years old. She had four children. At the time of filing, H.C. was 11 years old, J.J. was 9 years old, and twins Nor. B. and Nol. B. were 2 years old. H.C. and J.J. have diabetes, and H.C. has been diagnosed with autism. Nol. B. was born with a host of severe medical conditions. After

---

[2]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

his birth, he was diagnosed with neonatal sepsis and late onset Group B streptococcus (GBS) meningitis. Among other issues, he was diagnosed with hydrocephalus (which required the installation of a shunt to drain fluid from his skull), intraventricular hemorrhage, dysautonomia (which prevented his body from properly regulating his temperature), a seizure disorder, cortical blindness, and a developmental delay. On March 31, 2021, during the pendency of this case in the trial court, Nol. B. died of complications from GBS meningitis. Although an autopsy revealed that the manner of Nol. B.'s death was natural causes, allegations regarding appellant-mother's care of Nol. B. in 2018 and 2019 were the central basis for the initiation and continuance of this case.

¶ 6 On February 21, 2020, the State filed petitions for adjudication of wardship and motions for temporary custody for H.C, J.J., Nor. B., and Nol. B. Those petitions alleged that appellant-mother was hospitalized in May and July 2019 due to psychiatric issues and that appellant-mother had declined to follow recommended medical interventions for Nol. B.'s significant medical issues. The petitions also alleged that unspecified medical personnel opined that appellant-mother's actions regarding Nol. B.'s medical treatment constituted medical neglect and alleged that the children existed in an environment injurious to their welfare and that they were at substantial risk of physical injury. The State asked that the children be adjudged wards of the State. The same day, the trial court entered orders awarding temporary custody to DCFS.

¶ 7 On February 24, 2020, the trial court entered an order permitting appellant-mother supervised visits with H.C., J.J., and Nor. B. There are no transcripts in the report of proceedings until April 1, 2021, so we are left wanting for context as to what happened between February 2020 and April 2021. Nevertheless, in October and November 2020, defense counsel filed

approximately 20 exhibits in support of appellant-mother—possibly related to the issue of temporary custody.

¶ 8     A February 21, 2020, letter from Sara Stern, an occupational therapist from an organization named Sara's Pediatric Care, stated that she first met appellant-mother on October 29, 2018. She described appellant-mother as "extremely vigilant and resourceful in caring for her 4 children" and said that appellant-mother taught J.J. and H.C. how to monitor their glucose levels. She described appellant-mother's skill in caring for her children as that of a trained professional, which she attributed to appellant-mother's training as a home health aide for hospice and palliative care. Stern stated that appellant-mother avoided many hospitalizations for Nol. B. "through skillful feeding at his level of tolerance" and that "she is patient and works within his abilities, making sure he does not become dehydrated." Stern had "nothing but praise to give this mother for her parenting skills and her unselfish assistance she gives her children and friends when in need."

¶ 9     A February 21, 2020, letter from Carlos Flores, a licensed clinical professional counselor for an unknown organization, stated that appellant-mother had "plenty of understanding on how to care for her son and other children" and that he had not seen any signs of neglect or abuse toward the children. He wrote that appellant-mother "does all she can to support her family."

¶ 10    A February 25, 2020, letter from Dr. Mary E. Keen, MD, of Northwestern Medicine in Wheaton, Illinois, stated that its purpose was to "describe [her] confidence in the ability of [appellant-mother] to care for her son [Nol. B.]." Dr. Keen stated that Nol. B. had severe neurological impairments as a result of meningitis early in his life and that he was not expected to survive more than a few months. She also wrote that, when she cared for Nol. B. in the hospital in December 2019, appellant-mother demonstrated an "excellent ability to feed him even though

many staff struggled to do so." Dr. Keen described appellant-mother as being "very persistent in her efforts to ensure he got optimal care while avoiding unnecessary hospitalizations," and she wrote that appellant-mother had called for medical advice several times over the preceding two months.

¶ 11 While the State's petitions were pending, efforts were made to locate the father of H.C. and the father of Nor. B. and Nol. B. and serve them with notice of the proceedings. The State published a notice in the *Chicago Tribune* on March 12, 2021, and attempts to find and contact them were made over the course of the better part of a year. On September 24, 2021, the trial court granted the State's motion to default with respect to H.C.'s father, and on October 6, 2021, the trial court granted a motion to default with respect to the father of Nor. B. J.J.'s father was represented by appointed counsel.

¶ 12 B. Adjudication Hearing

¶ 13 The adjudication hearing took place on May 12, 2022. The State presented the live testimony of one witness, a caseworker for Lutheran Social Services of Illinois, Katherine McNerney.

¶ 14 1. Testimony of Katherine McNerney

¶ 15 a. Direct Examination

¶ 16 McNerney was assigned to appellant-mother's case in July 2019 after she was alerted to some mental health concerns. Appellant-mother told McNerney that she had gone to the police, claiming that her ex-boyfriend was stalking her. McNerney subsequently determined that some of appellant-mother's children had special needs, and on August 9, 2019, she met with appellant-mother to prepare to provide intact family services.

¶ 17    At her first meeting with appellant-mother on August 9, 2019, McNerney determined that appellant-mother was the sole caregiver for her four children. Both J.J. and H.C. have diabetes, and Nol. B. was not present because he was in the hospital due to dehydration. Appellant-mother told McNerney he had to be admitted because his maternal aunt had not been feeding him properly. Appellant-mother told McNerney that she suffers from bipolar disorder, for which she took Depakote and fluoxetine, and that her condition had resulted in psychiatric hospitalizations in the past. Appellant-mother did not produce any medication for McNerney to examine despite McNerney's requests.

¶ 18    Appellant-mother initially resisted participating in intact family services, but she eventually relented. When McNerney first met with appellant-mother at the family home, she was not able to speak with any of the children independently. Appellant-mother claimed that her children did not trust social workers or DCFS. However, McNerney was able to speak with the children briefly with appellant-mother in the room. The testimony she gave shed no light on what any of the children said.

¶ 19    In August and September 2019, McNerney visited appellant-mother's home weekly. At an unspecified time in August or September, McNerney asked appellant-mother to describe how often she checked H.C. and J.J.'s blood sugar and how often appellant-mother had to administer insulin. She did not provide appellant-mother's exact response. Instead, she claimed only that appellant-mother did not provide a "definitive answer." McNerney asked appellant-mother how often she obtained refills of their insulin prescriptions and how much insulin was being used every month. According to McNerney, appellant-mother said that the prescriptions were refilled as needed and that they never ran out. That response concerned McNerney because she did not get a specific,

direct answer. Later, McNerney said that appellant-mother told her once that J.J. had run out of insulin and she had to use H.C.'s insulin to supplement. There was no evidence at the hearing that appellant-mother had ever completely run out of insulin or that she was not refilling prescriptions.

¶ 20 Nol. B. was nonverbal and required assistance for the purposes of day-to-day care. McNerney learned that Nol. B.'s needs were "significant" and that he required "a lot" of medical attention. She expressed concern that, when appellant-mother held Nol. B., appellant-mother was "very rough," and McNerney "felt" that he was very fragile. When asked how often she fed Nol. B., appellant-mother said it depended on when he was hungry. McNerney asked appellant-mother how she knew when Nol. B. was hungry because he was nonverbal. Appellant-mother said she knew when Nol. B. was hungry because he was her son. This answer was apparently unsatisfactory to McNerney, who testified that she "didn't understand how that was communicated or how mother actually knew when he was hungry because he isn't—he wasn't verbal."

¶ 21 As to appellant-mother herself, McNerney initially recommended that she participate in a psychological evaluation and a follow-up psychiatric appointment at Riveredge Hospital. Appellant-mother scheduled an appointment for October 23, 2019, but maintained that she did not need a psychiatrist and did not need to participate in therapy because she was fine. McNerney described appellant-mother's response to the intact family case during August and September 2019 as one where, "[s]he didn't take responsibility. She minimized and didn't acknowledge the risk to the children." Appellant-mother did not attend her October 23, 2019, appointment because she had to care for Nol. B., and she did not reschedule it.

¶ 22 At the time McNerney was assigned to the case, Nol. B. was in the hospital. Appellant-mother informed McNerney that Nol. B. was in inpatient care because he was dehydrated.

Appellant-mother told McNerney that Nol. B. became dehydrated and had to go to the hospital because his maternal aunt had not been feeding him.

¶ 23    During one of her home visits between September and November 2019, McNerney became concerned about Nor. B.'s sleeping arrangements. Nor. B. was sleeping in a "pack-and-play" that had blankets and stuffed animals inside it. McNerney attempted to discuss "safe sleep" with appellant-mother, who said that Nor. B. was over the age of one, so it did not apply. McNerney offered no testimony as to what "safe sleep" meant to her or for what ages it should be a concern. Nor. B. was approximately 20 months old in September 2019.

¶ 24    McNerney also recommended that appellant-mother obtain a "0-to-3" evaluation for Nor. B., and appellant-mother said it was not necessary. Although McNerney testified that she explained why such an evaluation was important, the hearing testimony does not reflect what a "0-to-3" evaluation is or how it would address what McNerney believed to be a speech delay.

¶ 25    In November 2019, appellant-mother informed McNerney that she no longer wished to participate in the intact family program. Following that decision, McNerney obtained records from Loyola Health for Nol. B.'s last two appointments from October 31, 2019, and early November. An investigation into medical neglect was then opened following a hotline call from Loyola Hospital. Following the hotline call, appellant-mother agreed to continue with the intact family program because, according to McNerney, "she said that she wanted DCFS to get out of their lives so she would just do what was recommended." Appellant-mother subsequently followed through with obtaining some of her own psychiatric care and also with obtaining a "0-to-3" evaluation for Nor. B., though the record continued to be silent as to the purpose of such an evaluation.

¶ 26    McNerney described appellant-mother as combative and argumentative and said that it was difficult to get information from appellant-mother about the medical needs of the children. McNerney then offered opinions that appellant-mother's mental health issues were risk factors as it related to the safety of her children and taking care of their needs. She also opined that appellant-mother's failure to follow through with the special needs of her children until the aforementioned hotline call was placed was a risk factor, though she did not specify to which special needs she was referring.

¶ 27                      b. Cross-Examination from Public Guardian

¶ 28    On cross-examination, McNerney was questioned about appellant-mother's statement that she had supplemented J.J.'s insulin when she ran out by using some of H.C.'s insulin. McNerney was asked if that statement concerned her. McNerney responded that there was a concern that appellant-mother was not maintaining J.J.'s diabetes and that H.C. might run out of insulin.

¶ 29    She was also questioned about an incident where she was present with appellant-mother, Nol. B., and an occupational therapist. McNerney saw appellant-mother trying to feed Nol. B. a piece of a waffle, and it appeared Nol. B. was choking on the waffle. McNerney claimed that appellant-mother was not concerned.

¶ 30    She also discussed an encounter with appellant-mother and a DCFS nurse in the fall of 2019 where appellant-mother told McNerney that J.J. has asthma and was prescribed an inhaler. Although she asked to see it, she never saw J.J.'s inhaler. McNerney said, "the concerns were, what would happen if she needed it and there wasn't one accessible?"

¶ 31    Finally, McNerney testified that, on multiple occasions, there was a man in the home that McNerney believed was living there. Appellant-mother gave McNerney his name but did not provide a birth date, which prevented McNerney from running a background check.

¶ 32                    c. Cross-Examination by Defense Counsel

¶ 33    McNerney testified that she visited appellant-mother's home weekly throughout August and September 2019. In October and November 2019, she decreased the frequency of her visits to every other week. McNerney admitted that she believed appellant-mother's children were safe in appellant-mother's care between August and November 2019.

¶ 34    McNerney also acknowledged that appellant-mother had been working with an occupational therapist for Nol. B., as well as a physician (Dr. King), and a licensed clinical professional counselor named Carlos Flores. The occupational therapist and the counselor were services that appellant-mother obtained herself before DCFS became involved.

¶ 35    When questioned further about the incident with the waffle, McNerney admitted that her own notes said that Nol. B. simply had food in his mouth and said nothing about him choking. Her notes also reflected that appellant-mother took the food out of Nol. B.'s mouth when she saw he was not swallowing it.

¶ 36            2. Records from Riveredge Hospital, MacNeal Hospital, and Loyola Hospital

¶ 37    Following McNerney's testimony and in lieu of other live testimony that might have been subjected to cross-examination, the State sought to admit nearly 20,000 pages of medical records.

¶ 38    The State moved to admit People's exhibit Nos. 1 and 2, which contained appellant-mother's medical records from MacNeal Hospital and Riveredge Hospital. Defense counsel objected on the basis that both exhibits contained numerous records that were irrelevant, such as

the birth records of Nor. B., Nol. B., and J.J., or records from appellant-mother's psychiatric hospitalization in July 2018. The trial court initially agreed that such records were not relevant, but after further discussion it overruled the objection.

¶ 39 With the adjudication hearing in progress, the State asked the trial court to put the case "on a hold posture" because it was trying to obtain additional records from Loyola Hospital. The record indicates that the trial court recessed for approximately one hour, and when the matter was reconvened, the State offered Nol. B.'s records from Loyola Hospital as People's exhibit No. 3. The State specifically pointed out that People's exhibit No. 3C was "the opinion of Dr. Mary Jones in regards to [Nol. B.'s] care at that time." Defense counsel did not object, and the State rested.

¶ 40 Though we could not hope to summarize all of the records introduced, even if we wanted to, below we discuss some of the more pertinent records in the State's exhibits.

¶ 41 a. Riveredge Hospital Records

¶ 42 People's exhibit No. 2 showed that appellant-mother was admitted to Riveredge Hospital on July 25, 2018, and discharged on July 28, 2018. She presented with suicidal ideation and feelings of hopelessness. She explained that the father of Nol. B. and Nor. B. had recently moved out of the house, and she endorsed an increase in anxiety and more frequent panic attacks in the previous weeks. She was discharged with a diagnosis of major depressive disorder, recurrent, severe, and given prescriptions for Depakote, Ativan, and Ambien.

¶ 43 b. MacNeal Hospital Records

¶ 44 MacNeal Hospital records reflect that appellant-mother presented to the emergency room on May 3, 2019, complaining of a number of physical ailments such as stomach issues and renal failure. The treating physician noted that a complete workup was negative for any of the issues of

which appellant-mother complained, and he believed her complaints rose to the level of somatic delusions.

¶ 45 Appellant-mother was brought to MacNeal Hospital again on July 23, 2019, this time by way of emergency medical services. Though the records are unclear as to who relayed this information, they note that appellant-mother presented to a local police station and claimed that she was being stalked and that she had claimed to have sent "over 60 incoherent text messages to her alleged stalker" that day. A DCFS investigation was subsequently opened because appellant-mother had four children who require medical care. In the emergency room, appellant-mother told a staff member that she was being stalked and that she needed to be admitted to stay safe. Appellant-mother was diagnosed with bipolar disorder and prescribed Depakote before her discharge on July 26, 2019.

¶ 46                                  c. Loyola Hospital Records

¶ 47 People's exhibit No. 3 reflects that Nol. B. was admitted to Loyola Hospital on July 29, 2018, with hypothermia and lethargy and that he was discharged on August 1, 2018. He was seen for follow-up appointments multiple times throughout October, November, and December.

¶ 48 Nol. B. was admitted to the hospital again on January 1, 2019, for lethargy. While there he was treated for vomiting, diarrhea, and "seizure like activity." Eight months later on August 5, 2019, he was admitted again with shortness of breath, coughing fits, and gagging. The records noted that, although appellant-mother was present, Nol. B. was in his aunt's custody at that time. Nol. B. was treated for dehydration and high sodium, and he was discharged on August 13, 2019.

¶ 49    Appellant-mother brought Nol. B. to the pediatric clinic on August 22, 2019. The treatment notes indicated that Nol. B. had hypernatremia during his last admission, which was thought to be the result of dehydration due to inappropriate feeding when Nol. B. was living with his aunt.

¶ 50    Nol. B. presented for a visit on September 5, 2019. The notes indicated that, although he was 18 months old, he was behind on his 12-month and 15-month vaccines, which were administered that day. The notes also provided a lengthy list of Nol. B.'s diagnoses under the heading of "Patient Active Problem List," which we list here: altered mental status; hypothermia; group B streptococcus infection; thrombocytopenia; intracranial hemorrhage; seizure; subarachnoid hemorrhage; meningitis, bacterial; acquired obstructive hydrocephalus; temperature instability in newborn; meningitis; hydrocephalus; intraventricular hemorrhage; presence of cerebrospinal fluid drainage device; encounter for lumbar puncture; severe hypoxic ischemic encephalopathy; decreased responsiveness; abnormal results of liver function studies; transaminitis; diarrhea of presumed infectious origin; seizures complicating infection; dehydration with hypernatremia; weight loss; and acute kidney injury.

¶ 51    Nol. B. presented for an appointment on October 17, 2019, with symptoms of an upper respiratory infection that was suspected to be viral in nature. Nol. B. had some weight loss associated with the infection. Appellant-mother was instructed to return in two weeks for a weight check. He returned on October 31, 2019, with a temperature of 89.6 degrees and some wheezing. The doctor suspected bacterial pneumonia and recommended chest X-rays, which appellant-mother declined. The doctor offered inpatient admission. Appellant-mother declined and demanded antibiotics. The doctor agreed that Nol. B.'s signs and symptoms were concerning for an infectious process and prescribed Nol. B. with antibiotics.

¶ 52   Nol. B. presented for a follow-up appointment on November 8, 2019. Appellant-mother stated that Nol. B. was doing better and had been much more active that week compared to the previous week. Nol. B's temperature was 91.2 degrees, but appellant-mother stated that his temperatures at home had been at least 96 degrees. His rhinorrhea and cough were resolving. The doctor advised lab work and chest X-rays to rule out infection that could result in death. Appellant-mother declined any additional work-up on the basis that Nol. B. was doing much better.

¶ 53   Appellant-mother returned to the hospital six days later on November 14, 2019, at which time Nol. B. underwent a battery of tests and a chest X-ray. The X-ray was possibly indicative of pneumonia, but the results were difficult to interpret because two weeks had passed since the start of the infection. Nol. B.'s bloodwork showed low white blood cell and platelet counts. Appellant-mother was told on November 15, 2019, to bring Nol. B. back the following day for repeat bloodwork, which she did. At the time, Nol. B.'s white blood cell count had improved, but his platelet count had not.

¶ 54   Between November 2019 and December 2020, it appears appellant-mother sought care for Nol. B. through other providers unaffiliated with Loyola Hospital. However, Nol. B. returned to Loyola Hospital on December 10, 2020, for an endocrinology visit. At nearly three years old, Nol. B. was showing signs of early puberty. Appellant-mother declined magnetic resonance imaging (MRI) based on his temperature instability issues. The doctor recommended that appellant-mother bring Nol. B. back the following day to repeat lab work.

¶ 55   Appellant-mother returned seven days later on December 17, 2020, and Nol. B.'s tests revealed testosterone levels of a boy between the ages of 12 to 15. A doctor left appellant-mother a voicemail on January 29, 2021, that recommended Nol. B. start pubertal suppression therapy and

have an MRI. However the records also noted that the doctor said they could discuss other options because of Nol. B.'s temperature instability issues.

¶ 56     On December 31, 2020, Nol. B. presented for a neurosurgery follow-up where he was noted to have a history of "delayed GBS sepsis and meningitis with seizures, SAH, and subsequent extensive cystic encephalomalacia in both cerebral hemispheres."

¶ 57                              d. January 10, 2020, Report of Dr. Mary E. Jones

¶ 58     Included with the 18,000-plus pages of Loyola Hospital records was a "Child Advocacy and Protection Clinical Update" written by Dr. Jones. The opening line of the report read, "Reason for this note: this note is generated after DCFS report was made for medical neglect in Nov 2019. Agency requested Child Advocacy and Protection evaluation of medical record. Pt is a child with special health care needs following late onset GBS meningitis."

¶ 59     Dr. Jones summarized Nol. B.'s visits between October 17, 2019, and November 17, 2019, before writing:

        "ASSESMENT; [Nol. B.] is a child with complex medical conditions, therefore the evaluation for medical neglect is also complex. Mother was adherent bringing him to the clinic for follow up visits after he was diagnosed with rhino/enterovirus upper respiratory infection. However, there are 2 factors that support the allegation of medical neglect:

        1. Seriousness of Illness: Medical providers expressed concern about his extreme hypothermia and the risk that this may be a sign of serious infection. Of note: [Nol. B.] has dysautonomia—the inability of the brain to regulate among other things heart rate and temperature. It would not be unusual for him to present with hypothermia. However, after review of his medical record, he has never presented with temp as low as 89.6 degrees, so

- 15 -

the concern expressed by medical providers was warranted as well as the recommendations for work up and possible admission.

Consequences of noncompliance. If he were septic or had pneumonia (which were the concerns) the seriousness of the outcome could be death. The concern persisted after labs and chest xray presented concerning findings. It is unknown whether [Nol. B.] received follow up labs at Marian-Joy.

2. Parent's knowledge and understanding of the health conditions and risk. It was documented multiple times that mother understood the risks of not complying with the recommended medical evaluation. She declined work up, admission, follow up in ED if symptoms worsened and continued to request abx only. Although mother did eventually comply with labs it appears it was done after the hotline report was made."

¶ 60    Dr. Jones wrote that Nol. B. had recovered from his recent illness but that "it should not be assumed that mother's refusal to comply with medical recommendations caused no harm." Dr. Jones concluded her five-page report by writing that she had discussed her report with a DCFS investigator and that she was recommending that the "allegation should be Medical Neglect of Disabled Infant."

¶ 61                          3. Testimony of Yesenia Reyes

¶ 62    After the State rested, appellant-mother called Yesenia Reyes, who has known appellant-mother since they were children. She accompanied appellant-mother and Nol. B. to Loyola Hospital in November 2019 because Nol. B. was having chest pains and he was wheezing. She was present for a conversation between appellant-mother and a doctor in which the doctor

prescribed antibiotics for Nol. B. and said it was okay to go home. After Reyes's brief testimony, appellant-mother rested.

¶ 63                                C. Trial Court's Ruling and Disposition

¶ 64    On May 19, 2022, after closing arguments, the trial court issued its ruling. It found that the State met its burden by a preponderance of evidence to show "lack of care for the minor [Nol. B.] as well as neglect, injurious environment, and abuse, substantial risk of injury." As to the other minors, the trial court found "neglect, injurious environment only as to the other minors."

¶ 65    The trial court focused on Nol. B's hospital records from October 31, 2019, as well as Dr. Jones's opinion that the incident with Nol. B. at the hospital constituted medical neglect. The trial court stated that it believed appellant-mother's untreated mental health issues led to medical neglect. It further stated that, "this mother was not really controlling any of her children's medical condition [*sic*]. It's very concerning when you take one child's medication and use it for another child's health condition which is diabetes and not keep up to date with the medication."

¶ 66    At the disposition hearing, the State presented testimony from Andrew Weisgerber, a caseworker for Kaleidoscope. At the time, Nor. B. was 4, J.J. was nearly 12, and H.C. was 14. Weisgerber testified that Nor. B. and H.C. were living with their maternal aunt and had been since the initiation of the instant case. It appears this is the same aunt that was caring for Nol. B. in August 2019 when Nol. B. was hospitalized for dehydration. J.J. had been and was continuing to live with her father, Kendrick J.

¶ 67    Weisgerber testified that appellant-mother was seeing a psychiatrist monthly, that she was compliant with her medication, and that she was stable. He also stated that Nor. B.'s visits with appellant-mother typically began with Nor. B. protesting the visit, but after five minutes they "are

visiting pretty normally." H.C. had declined every visit with appellant-mother, and J.J. had reached out twice to appellant-mother for a visit, and appellant-mother did not get the messages because her phone number had changed. However, she had not requested any visits with J.J. on her own.

¶ 68    The trial court found that it was in the best interest of H.C., J.J., and Nor. B. to make them wards of the court and removed H.C. and Nor. B. from the custody of their natural parents. As to J.J., the trial court found her natural father fit, willing, and able and vacated the wardship with legal custody to stand with appellee-father.

¶ 69    The trial court placed H.C. and Nor. B. in the custody of DCFS with the right to place and the right to consent to all major medical and dental care.

¶ 70    As to permanency, Weisgerber recommended H.C. return home in four months, although he acknowledged that H.C. was nonresponsive when Weisgerber attempted to discuss that goal with him. He also recommended that Nor. B. return home in 12 months. On cross-examination, Weisgerber stated that appellant-mother was engaged in all of the services that were being asked of her and that she was making progress in those services. The trial court ruled that the goal for both Nor. B. and H.C. would be to return home in 12 months. This appeal followed.

¶ 71                                    II. ANALYSIS

¶ 72    The step-by-step framework for determining whether a child should be removed from his or her parent(s) and made a ward of the court is set forth in the Act. Proceedings begin upon the filing of a petition for wardship by the State, at which time the trial court must hold a temporary custody hearing to determine whether there is probable cause to believe that the child is neglected, whether there is an immediate and urgent necessity to remove the child from the home, and whether reasonable efforts have been made to prevent the removal of the child or that no efforts

reasonably can be made to prevent or eliminate the necessity of removal. 705 ILCS 405/2-10 (West 2020).

¶ 73    The trial court must then make a finding of abuse, neglect, or dependence before it conducts an adjudication of wardship. *Id.* § 2-21. The Act defines a "neglected minor" to include "any minor under 18 years of age *** whose environment is injurious to his or her welfare." *Id.* § 2-3(1)(b). The Act also defines an "abused minor" to include those under the age of 18 who live in the same household as a parent, immediate family member, or person responsible for the minor's welfare, and that person creates a substantial risk of physical injury to such minor by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss of impairment of any bodily function. *Id.* § 2-3(2)(i)-(ii).

¶ 74    Generally, "neglect" is defined as the "failure to exercise the care that circumstances justly demand." (Internal quotation marks omitted.) *Arthur H.*, 212 Ill. 2d at 463. However, this term is not limited to a narrow definition and, instead, by necessity has a fluid meaning. *Id.* "[Neglect] embraces wilful as well as unintentional disregard of duty. It is not a term of fixed and measured meaning. It takes its content always from specific circumstances, and its meaning varies as the context of surrounding circumstances changes." (Internal quotation marks omitted.) *Id.*

¶ 75    Likewise, Illinois courts have recognized that the term "injurious environment" is an amorphous concept that cannot be defined with particularity. *Id.* In general, however, the term has been interpreted to include "the breach of a parent's duty to ensure a "safe and nurturing shelter" for his or her children." (Internal quotation marks omitted.) *Id.* As a result, cases involving allegations of neglect and adjudication of wardship are *sui generis* and must be decided on the basis of their unique circumstances. *Id.* "This analytical principle underscores the 'fact-driven

nature of neglect and injurious environment rulings.' " *Id.* (quoting *In re N.B.*, 191 Ill. 2d 338, 346 (2000)). "In any proceeding initiated pursuant to the [Act], including an adjudication of wardship, the paramount consideration is the best interest of the child." (Internal quotation marks omitted.) *Id.* at 464.

¶ 76                              A. Timeliness of this Decision

¶ 77    Before proceeding to the heart of this matter, we first address the timeliness of our decision. The matter at bar is subject to an expedited disposition pursuant to Illinois Supreme Court Rule 311(a) (eff. July 1, 2018). Paragraph (a)(5) of Rule 311 requires us to issue our decision within 150 days after the filing of the notice of appeal, except where good cause is shown. Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). The trial court's final judgment was entered on May 19, 2022, and appellant-mother filed a notice of appeal on June 17, 2022. This means we would have ordinarily been required to issue our decision by November 14, 2022.

¶ 78    The record on appeal in this case was not filed until August 8, 2022. Appellant-mother then requested, and was allowed, three extensions of time to file the appellant's brief, which was not filed until February 9, 2023. The various appellees in this case also each requested multiple extensions of time to file their briefs, which were allowed, and the appellees' briefs were filed between April 20, 2023, and April 25, 2023. Appellant-mother filed her reply brief on May 8, 2023.

¶ 79    Under these circumstances, we find good cause for issuing our decision after the 150-day deadline contemplated by Rule 311(a)(5).

¶ 80      B. The Admissibility of Hospital Records at the Adjudication Hearing

¶ 81    Appellant-mother first claims that the trial court abused its discretion in admitting the records from MacNeal Hospital and Riveredge Hospital on the basis that the records were accompanied by certificates that did not comport with the rules of evidence and were therefore defective. She also claims that the records from Loyola Hospital were inadmissible because the signature on the certification accompanying those records was illegible.

¶ 82    These claims were not preserved with a timely objection at the hearing. However, appellant-mother has also failed to support these arguments with any plain-error analysis in her briefs. Just like it is possible to forfeit a claim, it is possible to forfeit a plain-error argument when a litigant fails to explain how either of the two prongs of the plain-error doctrine is satisfied. *People v. Hillier*, 237 Ill. 2d 539, 545-46 (2010). While forfeiture is a bar on the parties, and not a limitation on the courts, this "oft-cited proposition does not abrogate standard waiver and forfeiture principals and 'should not be a catchall that confers upon reviewing courts unfettered authority to consider forfeited issues at will.' " *People v. Pellegrini*, 2019 IL App (3d) 170827, ¶ 48 (quoting *Jackson v. Board of Election Commissioners of Chicago*, 2012 IL 111928, ¶ 33).

¶ 83    Because appellant-mother has supplied us with no argument or analysis, even a cursory one, as to which prong of the plain-error doctrine would permit review of these claims, we deem them forfeited and need not address whether the trial court erred in admitting these records.

¶ 84      C. Ineffective Assistance of Counsel

¶ 85    Appellant-mother next argues that defense counsel provided ineffective assistance by failing to (1) call medical professionals to rebut the State's evidence; (2) object to People's exhibit No. 3 because of illegible signatures on the certification and delegation; (3) object to People's

exhibit No. 3 because it did not comply with Illinois Rule of Evidence 902(11) (eff. Sept. 28, 2018) and section 2-18(4)(a) of the Act; (4) object to Dr. Jones's report; and (5) request a continuance after the State tendered 18,603 pages of records in the middle of the hearing.

¶ 86    The United States and Illinois Constitutions afford parents in abuse and neglect cases the right to the effective assistance of counsel. *In re Kr. K.*, 258 Ill. App. 3d 270, 280 (1994); U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2. This right flows from the gravity of the proceeding, which can result in the separation of a parent from a child, and the fact that abuse and neglect proceedings can often be a precursor to proceedings to terminate parental rights. *Kr. K.*, 258 Ill. App. 3d at 280. To sustain a claim of ineffective assistance, one must show both that defense counsel's performance was deficient, measuring it against an objective standard of competence under prevailing professional norms, and that, but for counsel's deficient performance, there was a reasonable probability that the outcome of the case would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984). A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* at 694. The benchmark for judging any claim of effectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. *Id.* at 686.

¶ 87    However, judicial scrutiny of counsel's performance must be highly deferential. *Id.* at 689. We should indulge the strong presumption that defense counsel's conduct falls within a wide range of reasonable professional conduct, and appellant-mother must overcome the presumption that the challenged action might be considered sound trial strategy. *Id.* When a claim of ineffective assistance is raised for the first time on appeal, our review is *de novo*. *People v. Lofton*, 2015 IL App (2d) 130135, ¶ 24.

¶ 88    With that framework at hand, we address the five different claims of ineffective assistance raised here. After evaluating each issue to determine whether counsel erred, we consider the issue of prejudice all at once because of the intertwined nature of these issues.

¶ 89            1. Failure to Call Medical Professionals to Rebut the State's Evidence

¶ 90    Appellant-mother claims that defense counsel provided ineffective assistance by failing to call five medical professionals who worked with appellant-mother and who would address her ability to care for Nol. B. and her compliance with mental health treatment and who would provide "incisive context for why [appellant-mother] rejected the pediatrician's recommendations on October 31, 2019."

¶ 91    Appellant-mother points out, as summarized earlier, that Dr. Keen, Ms. Stern, and Mr. Flores did, indeed, have glowing praise for appellant-mother and her ability to care for Nol. B. She also identifies a May 28, 2020, letter from Dr. Sharon Lieteau, MD, at the Westside Family Health Center and a July 1, 2020, letter from Allison Quinones, a clinical therapist. Dr. Lieteau wrote that appellant-mother had been in Dr. Lieteau's care since November 2019 and that appellant-mother had been compliant with appointments and medication. Ms. Quinones wrote that appellant-mother was cooperative, engaged, open, and honest and that she was skilled at advocating for herself to make sure her needs and those of her family were met.

¶ 92    It is difficult to deny that the letters from these five people paint a picture of appellant-mother as a responsible, caring, and capable mother, which is very different from how McNerney portrayed her. On the face of these letters, it appears that their testimony would have been extremely beneficial. However, there are several problems and hurdles that we cannot ignore.

¶ 93    Specifically referring to Dr. Keen and appellant-mother's claim that her letter provided context for the decision not to admit Nol. B. on October 31, 2019, we cannot agree. When Dr. Keen wrote that appellant-mother has been able to avoid unnecessary hospitalizations, there was no indication that she was referring to the October 31, 2019, incident or that she disagreed with the recommendation that Nol. B. be admitted. In fact, as Dr. Keen was affiliated with Northwestern Medicine, not Loyola Hospital, there was no indication Dr. Keen even knew of what took place on October 31, 2019.

¶ 94    As for the letters from Dr. Lieteau and Ms. Quinones, one of the arms of the State's case was not that appellant-mother never sought psychiatric care or therapy. Instead, it was that appellant-mother was highly inconsistent in obtaining that care. In fact, the testimony at the hearing was that appellant-mother only sought out psychiatric follow-up care in the winter of 2019 after DCFS opened an investigation into Nol. B.'s care and because she would do what DCFS wanted to get DCFS out of their lives. These letters did not contradict that theory.

¶ 95    Additionally, to find that defense counsel's actions here constituted ineffective assistance would require us to engage in speculation as to matters outside the record. Nothing in the record shines any light on discussions defense counsel might have had with any of these potential witnesses or the degree to which defense counsel investigated calling these witnesses. We have no way of knowing what defense counsel knew about these witnesses and what other testimony they might have to offer. There may have been perfectly valid reasons for seeking their assistance at the temporary custody stage prior to the hearing but not calling them as witnesses at the hearing. While it would have been helpful to have context for why defense counsel did not call these witnesses or what investigation defense counsel did, it is impossible to engage in any analysis

about whether this was sound trial strategy without such context. The consideration is not simply, as appellant-mother insists, whether these witnesses could have been helpful or hurtful based on their brief letters that were never subjected to the scrutiny of the adversarial process.

¶ 96    Defense counsel's conduct carries a presumption of reasonableness and a presumption that their choices were sound trial strategy. *Strickland*, 466 U.S at 689. We simply cannot pretend to know why defense counsel chose not to call these witnesses, whether they were even available, or what else took place outside the record. Appellant-mother has not overcome these presumptions.

¶ 97            2. Failure to Object to People's Exhibit No. 3 Because of Illegible Signatures

¶ 98    Appellant-mother claims that defense counsel was ineffective for failing to object to People's exhibit No. 3 because both the certificate and delegation contained a signature that was illegible. Appellant-mother relies on *Mashni Corp. v. Laski*, 351 Ill. App. 3d 727 (2004), which we find to be distinguishable. In *Mashni* we held that verifications pursuant to section 1-109 of the Code of Civil Procedure (735 ILCS 5/1-109 (West 2002)), which did not contain names or addresses and contained illegible signatures, were essentially anonymous, and thus there was no way to hold the individual who had signed the verification accountable. *Mashni*, 351 Ill. App. 3d at 735.

¶ 99    That is not the case here. The certificate and delegation for People's exhibit No. 3 contain two signatures, and while it is difficult to discern their precise names, their titles are perfectly legible. The documents also contain basic contact information for Loyola Hospital. If anyone had needed to ascertain the names of these individuals, it appears it would have been a trivial matter.

¶ 100   Moreover, there is nothing in the record to substantiate whether defense counsel knew their names. It is conceivable that defense counsel did not object because the identity of these

individuals was known to her and, thus, this was not a concern. Additionally, the idea that the signatures did not subject these individuals to the penalty of perjury presumes that we agree that Rule of Evidence 902(11) applies to records admitted pursuant to section 2-18(4)(a). As we discuss below, we have not resolved that issue in appellant-mother's favor.

¶ 101   Thus, it was not an error for defense counsel to fail to object to the nature of the signatures on People's exhibit No. 3.

¶ 102                    3. Failure to Object to People's exhibit No. 3 Because It Did Not

Comply with Rule 902(11)

¶ 103   Appellant-mother argues that defense counsel provided ineffective assistance for failing to object to People's exhibit No. 3 because its certificate did not comply with Illinois Rule of Evidence 902(11) (eff. Sept. 28, 2018).

¶ 104   The certification for People's exhibit No. 3 claimed that the records accompanying them were made in the regular course of business and that it was the regular course of business for the hospitals to make those records at the time or within a reasonable amount of time. But it was not notarized or otherwise a written declaration made under oath subject to perjury. The principal question before us is whether the certifications for records admitted under section 2-18(4)(a) require the same oath contemplated by Rule 902(11).

¶ 105   The parties have not cited any case law that has held that Rule 902(11) applies to section 2-18(4)(a), and likewise we have been unable to find any. Thus, we are presented with something of a conundrum. Determining whether Rule 902(11) applies requires statutory interpretation and, while we could perform the analysis necessary to determine whether Rule 902(11) applies to section 2-18(4)(a), to do so would be fruitless because it would not change our analysis. If we held

that Rule 902(11) does not apply to section 2-18(4)(a), then defense counsel committed no error and was not ineffective on that basis. If we held the opposite, it would be illogical of us to find that defense counsel had committed an unprofessional error. See *People v. Chatman*, 357 Ill. App. 3d 695, 700 (2005) (requiring counsel to predict future appellate court holdings would render "effective assistance" an impossible standard). What would become of the ineffective assistance standard if we held that it was an unprofessional error to argue something that is unprecedented or, at best, highly ambiguous? We cannot expect lawyers to predict the future or account for every possible as-of-yet unmade argument.

¶ 106   Accordingly, we cannot say that defense counsel erred for failing to object to People's exhibit No. 3 on that basis.

¶ 107                    4. Failure to Object to Dr. Jones's Report

¶ 108   We wholeheartedly agree that defense counsel erred by failing to object to Dr. Jones's report because it was prepared in anticipation of litigation. Unlike the previous issue, this issue only required defense counsel to apply existing, well-established evidentiary principles.

¶ 109   The rules of evidence for civil cases apply at adjudication hearings. 705 ILCS 405/2-18(1) (West 2020). Hearsay is thus inadmissible unless subject to one of our established hearsay exceptions. Ill. R. Evid. 802 (eff. Jan. 1, 2011). Business records created in the ordinary course of business, at or near the time of the occurrence, are deemed admissible by the Illinois Rules of Evidence and by the statutory exception contained in the Act. Ill. R. Evid. 803(6) (eff. Jan. 25, 2023); 705 ILCS 405/2-18(4)(a) (West 2020). However, records prepared in anticipation of litigation are not made in the regular course of business and are therefore not admissible. *In re J.Y.*, 2011 IL App (3d) 100727, ¶ 13. A record is prepared in anticipation of litigation if it is prepared

with an eye toward pending or anticipated litigation of any kind. *In re A.B.*, 308 Ill. App. 3d 227, 236 (1999). Our business records hearsay exceptions forbid the admission of documents created in anticipation of litigation because such documents lack the earmarks of trustworthiness and reliability of other records prepared in the ordinary course of business. *City of Chicago v. Old Colony Partners, L.P.*, 364 Ill. App. 3d 806, 819 (2006).

¶ 110    Appellant-mother relies on *In re A.P.*, 2012 IL App (3d) 110191, which we find persuasive. In that case, the State alleged that the children were abused and that the boyfriend of the children's mother had burned A.P.'s face with hot water. *Id.* ¶ 3. The State admitted letters and reports from the Pediatric Resource Center (PRC). These documents contained a statement from the boyfriend who claimed that A.P. had burned his face in the bathtub. *Id.* ¶ 5. They also contained a doctor's report opining that A.P.'s burns were consistent with child abuse. *Id.* ¶ 6. That opinion was supported by the reasoning that A.P. had no burns on his hands or arms, which would have been expected because children use their hands to try to catch themselves when they fall. *Id.* The doctor explained that it was not probable that A.P. fell and managed to catch himself in such a way that only the left side of his face, ear, and back of his neck were burned. *Id.*

¶ 111    On appeal, the court found that the admission of the PRC records was an abuse of discretion. *Id.* ¶ 16. The PRC's examination of A.P. and his records was done at the request of DCFS, and A.P. did not receive any follow-up medical care at the PRC. *Id.* Thus, the records and reports were not made in the regular course of business but were instead prepared in anticipation of litigation. *Id.* Our supreme court affirmed the appellate court's judgment, but it was only called upon to decide whether the outcome of the hearing was against the manifest weight of the evidence. *In re A.P.*, 2012 IL 113875.

¶ 112   The Public Guardian offers two alternative explanations for why Dr. Jones's report was created, neither of which we can accept. First, the Public Guardian claims that Nol. B.'s medical conditions were complicated and therefore it was prudent for DCFS to obtain an explanation of what care was required to meet Nol. B.'s needs.

¶ 113   Dr. Jones's report says nothing about what care Nol. B. requires on a regular basis. The bulk of her report is a summary of care Nol. B. already received between October 17, 2019, and November 17, 2019. If the goal of this report was to explain to DCFS what kind of care Nol. B. would need going forward, then her report was a failure. Dr. Jones's report contained a diagnosis section that lists 17 different conditions or ailments and does not explain any of them. Furthermore, we cannot help but notice that Dr. Jones does not appear to be a neurosurgeon, neurologist, endocrinologist, or any other specialist that might have had particular insight into Nol. B.'s conditions. Instead, Dr. Jones signed her report, "Mary E. Jones MD, MJ, MPH, Child Advocacy and Protection."

¶ 114   The Public Guardian also claims that Dr. Jones's report "could have been used to determine the appropriateness of or if additional intact services were needed." The record does not support a conclusion that that was ever the case, but our concern is why it was prepared, not what other ancillary uses the report might have had after it was prepared. *A.B.*, 308 Ill. App. 3d at 236. This is not a situation where the report was prepared in the regular course of business and also had a coincidental use in litigation like the DCFS client service plans in *A.B.* See *id.*

¶ 115   Whatever aspirational uses Dr. Jones's report might have had, the plain language of her report makes obvious the reason why it was created. The very first line of the report is explicit that it was created after DCFS requested a "Child Advocacy and Protection" evaluation. Exactly what

type of evaluation DCFS sought was made clear later when Dr. Jones wrote, "[Nol. B.] is a child with complex medical conditions, therefore *the evaluation for medical neglect is also complex.*" (Emphasis added.) She then summarized two different points "that support the allegation of medical neglect." Finally, Dr. Jones concluded her report by writing, "The above issues were discussed with DCFS investigator Debra Jones. [Nol. B.] is a disabled child. *Suggest that allegation should be Medical Neglect of Disabled Infant.*" (Emphasis added.)

¶ 116   Dr. Jones's report not only offered a specific legal opinion that Nol. B. was neglected, rather than a medical diagnosis, but it recommended what allegations DCFS should make going forward—recommendations that DCFS adopted in the affidavits attached to the State's petitions. Dr. Jones also provided no treatment in connection with that report. Created almost two months after the last treatment date Dr. Jones summarized, and a little more than a month before the petitions in this case were filed, her report was undeniably created in anticipation of litigation.

¶ 117   Father-appellee asserts that Dr. Jones's report was not prepared in anticipation of litigation. Instead, he insists it was "requested to determine if this case should be brought to court." Considering that litigation is the act of bringing a particular controversy to court by way of a lawsuit, we reject this meager attempt at semantic wordplay.

¶ 118   Father-appellee also claims that to hold that Dr. Jones's report was prepared in anticipation of litigation would be to "assert that all medical opinions result in the anticipation of litigation." Section 2-18(4)(a) of the Act already contemplates the admission of records that contain diagnoses and medical opinions. Dr. Jones's report is a different animal. It is clear DCFS asked Dr. Jones for an opinion about the legal issue of neglect and a recommendation for how DCFS should proceed. It does not follow from this that all medical opinions should be barred from admission through

section 2-18(4)(a), nor does this prevent anyone from seeking guidance from medical professionals.

¶ 119   Dr. Jones's report was inadmissible because it was prepared in anticipation of litigation, and defense counsel erred by failing to object to its admission.

¶ 120                                    5. Failure to Request a Continuance

¶ 121   Appellant-mother claims that defense counsel also provided ineffective assistance because she failed to object to the State tendering 18,603 pages of discovery midhearing and failed to request a continuance. This issue, while perhaps not an error in a vacuum, is inextricably intertwined with the other error we have recognized. After all, if we find that defense counsel was ineffective for failing to object to Dr. Jones's report, surely defense counsel's failure to ask for the requisite time to review and discover that evidence is at least partly to blame.

¶ 122   The notion that defense counsel felt she was prepared to proceed with appellant-mother's case-in-chief immediately after receiving 18,603 pages of records pertaining to the medical care of Nol. B., the treatment of whom was at the very heart of this case, is disquieting to say the least. It must be noted that nothing in the record reflects that defense counsel had seen these records before that day, and none of the parties make such a claim.

¶ 123   As we have said, these proceedings are serious, and they place certain liberty interests at stake. At a minimum they can, as occurred here, result in the separation of a parent from a child. *Kr. K.*, 258 Ill. App. 3d at 280. These cases can also often be precursors to proceedings to terminate parental rights, and the evidence presented in an abuse or neglect case can be used against a parent in those parental rights termination cases. *Id.*

¶ 124 Basic discovery principles apply in proceedings under the Act. See *In re R.V.*, 288 Ill. App. 3d 860, 868-69 (1997). The purpose of pretrial discovery is to promote fair, efficient, and expeditious proceedings leading to the truth, as opposed to a trial that is nothing more than a battle of wits. *Velarde v. Illinois Central R.R. Co.*, 354 Ill. App. 3d 523, 531 (2004). That purpose was subverted here. While there is no absolute right to a continuance and we have held that serious delay in the adjudication of abuse, neglect, or dependency cases can cause grave harm to the minor, the trial court can grant a continuance when consistent with the health, safety, and best interests of the children. *In re K.O.*, 336 Ill. App. 3d 98, 104 (2002).

¶ 125 The timeline for this case provides valuable context. It was initiated in February 2020, approximately four months after the events at Loyola Hospital. This case did not proceed to an adjudication hearing for more than two years after that. On the day of the hearing, May 12, 2022, the State answered ready, even though it was still awaiting 18,603 pages of medical records from Loyola Hospital. After presenting the testimony of one live witness, the State sought to move People's exhibit Nos. 1 and 2 into evidence. Then it requested a recess, at which time it returned with the aforementioned deluge of Loyola Hospital records, and it was permitted to move those into evidence. The State rested, and the very next thing to occur was appellant-mother's case-in-chief.

¶ 126 It must also be noted that the certification and delegation of authority attached to these records were signed on January 27, 2022, approximately 3½ months earlier. While we do not accuse anyone of intentional gamesmanship, whether the State had these records all along or simply failed to follow-up in the lead-up to the hearing, the end result was the same. Defense counsel was confronted with a mountain of records moments before beginning her case-in-chief.

We cannot imagine how defense counsel could take no issue with this document production at the eleventh hour and fifty-ninth minute, especially knowing that the alleged events at Loyola Hospital on October 31, 2019, were central to this case. We also question why these records were not produced until the middle of the hearing when the affidavits accompanying the February 21, 2020, petitions specifically referenced Dr. Jones's opinion that Nol. B. was neglected. This means that DCFS and the State were aware of Dr. Jones's report as early as February 2020.

¶ 127   The Public Guardian claims that defense counsel's statement during closing argument, "From everything in the record it appears that the mother was taking care of her children," is proof that defense counsel reviewed the records. It is one thing for zealous advocates to highlight helpful facts and downplay harmful facts. But it is another to do violence to the record by misrepresenting it. Closing arguments in this case took place on May 19, 2022, a week later.

¶ 128   We are fooling ourselves if we believe for even a moment that defense counsel could have reviewed those records in the 70-minute recess that took place, assuming she had all 70 minutes to review them. Some rudimentary math indicates defense counsel would have had to read nearly 4½ pages per second to have a chance at reviewing this information in that time frame. Of course, that is merely reading, not understanding, and certainly does not account for the time necessary to investigate or attempt to prepare a defense—particularly where those records contained a report from a medical doctor that offered a legal conclusion that clearly required specialized knowledge. Beyond that, whether defense counsel had the opportunity to review some of those records in the week between the receipt of evidence and closing arguments is a meaningless inquiry because it was too late to challenge those records, investigate them, or otherwise attempt to prepare a defense around them.

¶ 129    This could not have been a strategic decision. See *Strickland*, 466 U.S at 689. Defense counsel would have to have known what was in the records in order to make an informed decision about whether to proceed, and there was nothing that could conceivably be gained by proceeding without a chance to review them. To the contrary, there was everything to lose—especially because there is nothing to indicate defense counsel knew these records included an opinion from Dr. Jones.

¶ 130    Appellee-father urges us to adopt the position that even though these records were tendered "late," which is putting it mildly, they should still have been considered because our primary concern is the best interest of the children.

¶ 131    First, a continuance would not have prevented them from being considered. Second, we agree that our prime concern is the best interest of the children. *Arthur H.*, 212 Ill. 2d at 464. However, the phrase "the best interests of the children" cannot be a shibboleth that we repeat blindly in opposition to any argument that error occurred. Believing evidence should be adequately investigated and tested before separating children from their parent and the best interests of the children are intertwined; after all, how can anyone presume to know what is in the best interests of the children based on a flawed process? It would behoove us and the parties not to treat these cases like a *fait accompli*.

¶ 132    A request for a continuance to allow defense counsel to review 18,603 pages of records that were tendered midhearing would have been an appropriate response to what was a tardy action on the part of the State. When we describe what is in the best interest of the children, we cannot be describing a process where the State unloads a mountain of evidence on defense counsel at the last minute. We think defense counsel's comfort with and total acquiescence to what transpired cannot be countenanced.

¶ 133    The problems that flow from this are numerous. Defense counsel had no time to review these records, discover Dr. Jones's report, and prepare a defense or objection to it. She had no time to investigate these records, put on evidence in response to them, or seek the assistance of a doctor for consultation or expert testimony. And she had no opportunity to review these records with her client to help appellant-mother make an informed decision about testifying. In other words, she had no opportunity to do the things that we would expect of a reasonable litigator.

¶ 134    Defense counsel made an unreasonable error by not insisting on time to review 18,603 pages of records that the State tendered midhearing, which is directly connected to the failure to object to Dr. Jones's report.

¶ 135                                                 6. Prejudice

¶ 136    Having determined that defense counsel committed two errors here, the *Strickland* standard also requires us to consider prejudice to determine if there was a reasonable probability of a different outcome but for defense counsel's errors. To understand the magnitude of the prejudice that resulted, we must discuss what would have been left if Dr. Jones's report was properly excluded. The remaining evidence was not particularly compelling.

¶ 137    We can start with the testimony of McNerney, which contained little in the way of concrete evidence against appellant-mother and often amounted to subjective hand-wringing. McNerney found appellant-mother to be difficult, combative, and providing vague answers, which is proof of absolutely nothing when it comes to abuse or neglect. She also testified that appellant-mother refused to produce bottles of medication or an inhaler and only produced prescription printouts, which was similarly not proof that appellant-mother or her children were not getting their medication. Likewise, McNerney took issue with Nor. B.'s sleeping arrangements and lack of a 0-

to-3 evaluation, but the State never elicited enough testimony to tie these things together with the ultimate theory that appellant-mother was neglectful or that the children were in an injurious environment.

¶ 138   McNerney also had concerns that appellant-mother was not properly managing J.J.'s and H.C.'s diabetes and that her psychiatric condition was preventing her from caring for her children. But McNerney was not a medical doctor capable of determining that. There was no evidence McNerney had any idea what it would mean for their diabetes to be uncontrolled or what that would look like. Her concerns were nothing more than speculative. Appellant-mother's last hospitalization was in the summer of 2019, and McNerney learned about this supposedly concerning information about insulin in August or September 2019. But she was not concerned then. To the contrary, she testified that she thought the children were safe with appellant-mother between August and November 2019. Apparently, these concerns manifested later after receiving Dr. Jones's opinion.

¶ 139   Importantly, the trial court relied on McNerney's testimony to conclude that H.C. and J.J.'s diabetes was not being controlled, but none of the evidence substantiated that. McNerney testified that appellant-mother said that H.C. had run out of insulin and she had to supplement H.C.'s prescription with J.J.'s insulin. There was no evidence at the hearing that either child had ever gone without insulin, that appellant-mother was not administering insulin, or any other evidence that would support the conclusion that H.C.'s and J.J.'s diabetes was uncontrolled.

¶ 140   That brings us to the various medical records from MacNeal and Riveredge, which detailed appellant-mother's two psychiatric hospitalizations in 2018 and 2019. While we do not downplay the seriousness of requiring inpatient psychiatric admissions, these on their own do not establish

anything related to the care of appellant-mother's children or whether they were being subjected to an injurious environment, particularly at the time the petitions were filed.

¶ 141   Finally, that leaves us with the remaining records from Loyola Hospital. The appellees insist that these records themselves are incontrovertible proof of appellant-mother's neglect. We see no way to conclude that when there was no testimony from an expert witness to help us make sense of them. This is not a case, for example, where Nol. B. had suffered injuries that were obviously intentionally inflicted by a parent. Nor is it a case where Nol. B. was simply not getting medical attention that he needed. To the contrary, the records entered into evidence indicate appellant-mother was constantly and routinely seeking out medical care for Nol. B. Instead, this case turned largely on whether appellant-mother's decisions over approximately a two-week span, which involved Nol. B. receiving some medical care and tests, were *enough*.

¶ 142   Nol B. had extremely complicated and numerous ailments, and it seems apparent from the records that he repeatedly and often required significant medical care independent of what appellant-mother was doing. To say whether appellant-mother's actions were neglectful would first require an understanding of those conditions. How can we say that appellant-mother failed "to exercise the care circumstances justly demand," without a full understanding of those conditions? (Internal quotation marks omitted.) *Arthur H.*, 212 Ill. 2d at 463.

¶ 143   We can only guess what these records mean, in both a literal sense and practically what they meant for Nol. B.'s long-term health. Even if we were to impermissibly go beyond the record, where would that leave us? It would be a far cry from understanding this material on the level necessary to examine Nol. B's records from October 31, 2019, and beyond and determine whether appellant-mother's decision not to admit Nol. B. and refuse X-rays constituted neglect. After all,

might there be legitimate reasons why a mother would want to avoid inpatient hospitalization for her immunocompromised child unless absolutely necessary? Moreover, on October 31, 2019, even the treating physician agreed that Nol. B.'s signs and symptoms were consistent with an infectious process and agreed to prescribe antibiotics. It was not as though appellant-mother was refusing all medical intervention for Nol. B. or disregarding the fact that he was ill. Even Dr. Jones could not identify specific, tangible harm that resulted from this incident and could only speculate. So how could we do the same on our own?

¶ 144   The trial court's ruling focused on three major aspects: (1) the issue of J.J.'s and H.C.'s insulin; (2) Nol. B.'s records from October 31, 2019, and some of his subsequent treatment; and (3) Dr. Jones's report. Nol. B's. medical records and Dr. Jones's opinion were the focus of the trial court, and it is clear that Dr. Jones's opinion was instructive to the trial court as to how it should interpret Nol. B.'s records. The trial court expressed no opinion of its own about what Nol. B's records meant—and how could it? If we remove Dr. Jones's opinion from the equation, we find there is little to show actual abuse or neglect. Dr. Jones's report was powerful evidence, especially when it was not subjected to any scrutiny or cross-examination, and we cannot say that the failure to prevent its admission was without prejudice.

¶ 145   Ultimately, our question is whether defense counsel's conduct prevented the adversarial process from functioning and undermined our confidence in the result. *Strickland*, 466 U.S. at 686. Dr. Jones was not required to come to court and testify under oath. She was not required to provide qualifications that would render her competent to provide an expert opinion. There was no examination of what information she reviewed or disregarded, or what criteria she used to determine that Nol. B. was neglected. We have no way of knowing whether her definition of

neglect is even the same as that provided by the Act. There was no ability to explore her biases or motives or even whether DCFS compensates her for completing such a report. We cannot say the adversarial process functioned properly with any confidence when such highly prejudicial and persuasive evidence, which told the trier of fact what to make of the ocean of records before it, was admitted without the slightest objection from defense counsel.

¶ 146   Accordingly, but for defense counsel's errors there was a reasonable probability that the outcome would have been different.

¶ 147                              D. Hearing Procedure and Evidence

¶ 148   Although not necessary to the disposition of this case, and unrelated to any of the issues raised by the parties, we take a moment to express our bewilderment at the way the evidence in this case was presented.

¶ 149   First is the fact that the State intended to prove its case almost entirely through cold medical records. Somewhere on the order of 20,000 pages of records were admitted into evidence in this case. In its brief, the Public Guardian asserted that all 18,603 pages of Nol. B.'s medical records were evidence of appellant-mother's refusal to comply with her doctors' recommendations. Even a cursory examination of Nol. B's records reveals that to be a rather severe embellishment, as a huge number of those 18,603 pages have nothing to do with any of the events pertinent to this case. On top of that, in closing argument in the trial court and in the briefing on appeal, the parties have referenced only a tiny fraction of the mountain of documents that were submitted. Clearly, most of these records were not particularly important.

¶ 150   We understand that there was disagreement in the trial court about whether these records could be submitted piecemeal with irrelevant records omitted. But the certifications and

delegations of authority for business records are foundational requirements, and nothing more. 705 ILCS 405/2-18(4)(a) (West 2020); Ill. R. Evid. 803(6) (eff. Jan. 25, 2023); Ill. R. Evid. 902(11) (eff. Sept. 28, 2018). Assuming there are no defects in those documents, surely the parties could reach some arrangement about which records are relevant to the matter at hand so as to avoid the absurd result that was achieved here.

¶ 151    Additionally, while we recognize that section 2-18(4)(a) permits the admission of business records and that it places no explicit limits on how much evidence can be admitted this way, we are forced to ask: should there be limits?

¶ 152    Hearsay exceptions are meant to be just that—exceptions—and not the rule. Part of the rationale for business records exceptions is that businesses will flounder if they cannot keep accurate records, and therefore there is little reason to doubt the veracity of the information contained in them. *Kimble v. Earle M. Jorgenson Co.*, 358 Ill. App. 3d 400, 414 (2005). But the records admitted in this case were not admitted only for simple reasons such as proving whether a diagnosis was made, or whether medical care took place on a certain day, or even if a particular recommendation was made as to treatment. They were also admitted to prove a legal conclusion, which is that Nol. B. was neglected or abused. But how can we be expected to evaluate records like this and draw factual and legal conclusions from them when we are not doctors and have no medical testimony to help us understand them?

¶ 153    To illustrate this point, here is an excerpt of Nol. B.'s records from August 22, 2019:

"[Nol. B.] is a 19m w/ PMHx ex 36 weeker, neonatal sepsis 2/2 late onset GBS bacteremia and meningitis with significant neurologic sequelae, obstructive hydrocephalus s/p R Ommaya, IVH, seizure disorder, and developmental delay."

¶ 154   What does any of this mean? Is this relevant? Does this provide any context for whether Nol. B. was neglected? We can only guess, and the records in evidence are replete with examples of this problem. The result here is that the State entered 20,000 pages of medical records into evidence *en masse* and effectively said to the trier of fact, "you figure it out." If our goal is to arrive at fair and accurate dispositions in cases that have serious and far-reaching consequences, expecting the judiciary to be able to decipher thousands of pages of medical evidence with no assistance understanding that evidence would seem to be folly, at best. This is not a problem for which we have no solution, either. Illinois Rule of Evidence 702 (eff. Jan. 1, 2011) exists to facilitate the use of expert testimony when specialized knowledge will aid the trier of fact—as it would have here.

¶ 155   We must also take a moment to issue a brief reminder. The requirements of Illinois Supreme Court Rule 341 (eff. Oct. 1, 2020) are not optional. When Rule 341 requires citations of the record or authority, it is not a suggestion, nor is it a hollow ritual. Likewise, citation of unpublished orders pursuant to Illinois Supreme Court Rule 23 (eff. Feb. 1, 2023) filed before January 1, 2021, remains improper.

¶ 156                                              III. CONCLUSION

¶ 157   We reverse the trial court's judgment and remand for a new hearing.

¶ 158   Reversed and remanded.

***In re H.C.*, 2023 IL App (1st) 220881**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, Nos. 20-JA-330, 20-JA-331, 20-JA-333, the Hon. Tiesha Smith, Judge, -presiding. |
| **Attorneys for Appellant:** | Sharone R. Mitchell Jr., Public Defender, of Chicago (Ross K. Holberg), for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham and Gina DiVito) for the People. |
| | Charles P. Golbert, Public Guardian, of Chicago (Kass A. Plain and Carrie Fung), guardian *ad litem*. |
| | Marv Raidbard, of Skokie, for other appellee. |