2023 IL App (1st) 230261

FIRST DISTRICT
SECOND DIVISION
December 5, 2023

No. 1-23-0261

| | | |
|---|---|---|
| *In re* KH. M. and KY. M., Minors, | ) | Appeal from the |
| | ) | Circuit Court of |
| | ) | Cook County. |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | Nos.   22 JA 392 |
| | ) |           22 JA 393 |
| v. | ) | |
| | ) | |
| S.D., | ) | |
| | ) | Honorable |
| Respondent-Appellant). | ) | Maxwell Griffin, Jr., |
| | ) | Judge Presiding. |

JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Justices Ellis and Cobbs concurred in the judgment and opinion.

## OPINION

¶ 1      Respondent S.D. appeals the Cook County circuit court's disposition order adjudicating

the minors, Kh. M. and Ky. M., wards of the court and finding the minors were neglected and

abused. Respondent argues that her trial counsel was ineffective for failing to move to dismiss

the wardship petitions rather than waive the 90-day time limit for the adjudicatory hearing to

commence. According to respondent, the trial court would have been obligated to grant a motion

to dismiss under section 2-14(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705

ILCS 405/2-14(b) (West 2020)). Section 2-14(b), which will be discussed in detail below,

provides that an adjudicatory hearing shall be commenced within 90 days of the date of service

of process upon the minor, parent, and any guardian. *Id.* If the hearing is not commenced within

that time period, then upon a motion from any party, the petition shall be dismissed without prejudice. *Id.* § 2-14(c).

¶ 2 Before reaching the merits of this appeal, we set forth the factual background leading up to the trial court's finding that the minors were neglected and it was in their best interest to be made wards of the court.

¶ 3 Respondent is the natural mother of the minors, boy and girl twins Kh. M. and Ky. M., born prematurely on July 10, 2019. On May 26, 2022, the State filed petitions for the adjudication of wardship of the minors. The petition for Kh. M., the male twin, alleged the following supporting facts:

> "Mother failed to follow-up with this minor and minor's twin sibling's medical needs after their birth. On or about May 16, 2022 this minor was hospitalized due to being lethargic. Mother delayed seeking medical treatment for this minor after he became symptomatic. Mother failed to cooperate with medical personnel and refused to consent to have this minor transferred to a hospital that could address his needs. Per medical personnel this minor is malnourished, severely dehydrated and in acute renal failure. Medical personnel state that this minor is severely ill and his condition is life threatening. Medical personnel state that this minor has been medically neglected. Putative father's whereabouts are unknown and paternity has not been established."

The petition for Ky. M., the female twin, alleged generally the same facts for Kh. M.'s medical neglect. Both petitions listed the father as D.M., also known as D.B., "and all whom it may concern." Two addresses in North Las Vegas, Nevada, were listed for D.M.

¶ 4    The petitions were supported by an affidavit from Karla Robertson, an investigator with the Department of Children and Family Services (DCFS). Robertson stated that the case came to the attention of DCFS on May 16, 2022, when respondent brought Kh. M. to Elmhurst Hospital with complaints that the minor had not taken in any liquids for the past couple of days. Robertson detailed as follows:

> "Mother reported that Kh. M. only drinks milk, and takes no solid food even though Kh. M. is almost 3yrs old (DOB:7/10/19). Kh. M. was transported to Loyola University Medical Center and was seen by the Child abuse/neglect team. After further examination and speaking with the mother, it was determined that [Kh. M.] was in full renal failure, had not had solid food since 18 months of age, and was suffering from malnutrition. According to the Child abuse/neglect team at Loyola Medical Center, [Kh. M.] and his twin sister [Ky. M.] were born premature and needed a lot of follow-up care but had none. Mother reported to the child abuse doctor that she did not follow up with medical care because she did not believe that the twins needed to see a doctor. When asked about why she had not sought care after [Kh. M.] stopped eating and was losing weight, mother reported to the team that she could not get a ride."

The court took temporary custody of the minors with regard to respondent on May 27, 2022, following a temporary custody hearing conducted by video conference.

¶ 5    On June 6, 2022, D.M. testified via Zoom at a subsequent temporary custody hearing. He stated that he was the father of the minors but he had never claimed paternity and was not paying child support. The State asked the court to order a DNA test for the minors and D.M., but the court deferred the issue of paternity to the "home courtroom." At the conclusion of the hearing,

the court took temporary custody of the minors as it pertained to the father. At the next hearing on June 13, 2022, the Cook County Public Guardian requested a DNA test for both children and D.M.[1] The court ordered the DNA test over D.M.'s objection. At the time of the hearing, Kh. M. remained hospitalized, and Ky. M. was placed with her maternal grandmother. Respondent was granted supervised day visits.

¶ 6     On July 28, 2022, DCFS filed an emergency motion to suspend visitation. The motion alleged that during a supervised visit on July 26, 2022, respondent abducted Ky. M. at the Maywood field office.

> "The assigned worker followed the mother onto the elevator to try to retrieve the minor—the worker called 911 while on the elevator. The mother ran out to the parking lot with the baby. The case worker followed mother and child. The case worker was repeatedly kicked by mother. The mother drove off in a car with a female driver. An Amber Alert was issued. At approximately 2:00 p.m. the Chicago Police located the child who was taken to La Grange Hospital to be

---

[1]We note that, while the minors are twins, they are fraternal twins and both received a DNA test because it was possible they could have different fathers. "If a woman has [sexual intercourse] with either one man or with different men during a single polyovalutory period, superfecundation could result and the twins could have either the same father or different fathers, respectively. [Citation.] The scientific community considers twins having two different fathers as a rare phenomenon. This phenomenon is known as heteropaternal superfecundation, and the twins born are said to be bipaternal or heteropaternal twins." *Passaic County Board of Social Services ex rel. T.M. v. A.S.*, 120 A.3d 978, 983 (N.J. Super. Ct. Ch. Div. 2015).

> medically assessed. The current whereabouts of the Mother are not known, but she may be incarcerated."

On July 29, 2022, the court granted the motion to suspend visitation without prejudice.

¶ 7 At the August 25, 2022 status hearing, the prosecutor informed the court that D.M. had missed his initial appointment for a DNA test and was unsure if he went to a subsequent appointment. The court observed that the minors had not been tested. Respondent remained in custody.

¶ 8 The next status hearing was held via video conference on September 21, 2022. The State presented the DNA results for Kh. M. and D.M., but Ky. M. had not been tested at that time. The certified DNA test report indicated that there was a 0% probability that D.M. was Kh. M.'s father. The court entered a finding that D.M. was not the father of Kh. M. and that the results for Ky. M. remained pending. Respondent testified that she did not have another name for a putative father(s). The State asked the court for leave to publish to unknown parties and all whom it may concern regarding Kh. M.'s putative father, which the court granted.

¶ 9 The court also considered the request by respondent to restore visitation. DCFS called caseworker Rolanda Collins to testify. Collins testified that she was assigned the case in May 2022. She was supervising respondent's visit with Ky. M. on July 26, 2022, at the DCFS Maywood office. During the visit, respondent was on the telephone with Ky. M. in her arms. Then respondent "got up, and she said [Ky. M.] needed to get some air," and Collins told respondent that they needed to stay in the room. Respondent "proceeded out" of the visitation area and walked to the elevator with Ky. M. in her arms. Respondent pressed the elevator button. Collins then called her supervisor to report that respondent was trying to take the child while Collins continued to tell respondent that she was not able to take the child from the area.

Respondent then got into the elevator, and Collins entered behind her. Collins tried to stop the elevator.

¶ 10    When the elevator stopped on the second floor, respondent "jumped out" and ran to the stairs with Collins behind her. Respondent continued to the first floor and past security. Collins told her to stop and that she was abducting a child. Collins did not physically touch respondent. Respondent did not say anything to her. As respondent went outside, Collins followed and said she was going to call the police, and respondent said, "I don't give an F. I am taking my child."

¶ 11    Respondent then "jumped in the back of a silver car that was waiting for her." Collins ran to the car door and tried to keep it from closing. Respondent then kicked Collins. Collins told respondent to stop and she was calling 911 because she was abducting a child. The driver proceeded to drive, and the door slammed. Collins then called 911, reported the abduction, and provided the license plate of the car. Collins was injured during the abduction and sought medical attention.

¶ 12    The police recovered Ky. M. by going to respondent's home. The police broke down the door, and Ky. M. was present with respondent, and respondent was placed under arrest. Thereafter, Ky. M. was placed with a new, traditional (nonrelative) foster parent.

¶ 13    Collins also testified that the case was transferred to a new agency because the minors needed a specialized foster home. The intent was to place the minors together when Kh. M. was released from medical care. She stated that Kh. M. was doing well. He was walking and playing and had gained close to 30 pounds. She described Ky. M. as happy and playful.

¶ 14    Following Collins's testimony, the prosecutor informed the court that, according to the circuit clerk's system, respondent had been charged with kidnapping by force or threat, aggravated battery of a government employee, and child abduction. The court entered an order

that respondent would be offered at least one video visit per week and DCFS had discretion to resume in-person visitation with 14 days' written notice to all parties. The court also entered an order that DCFS refer the minors to play therapy within 21 days and that DCFS refer respondent for a mental health assessment within 21 days.

¶ 15    The trial court conducted the October 19, 2022 status hearing via video conference. The State informed the court that Ky. M. had not yet been taken for DNA testing. DCFS counsel indicated that Stephanie Cole, the "UCAN"[2] caseworker, would be taking Ky. M. for testing the next day. The State also informed the court that the notice by publication for Kh. M.'s unknown father was published in the *Chicago Tribune* on September 26, 2022. The State presented an exhibit of the publication to the court. The court observed that there was no appearance of a putative father for Kh. M. and entered a default order regarding Kh. M.

¶ 16    Also on October 19, 2022, an order waiving the adjudicatory hearing time limit was entered and file-stamped. The waiver stated that all of the parties agreed to waive the time limit for the adjudicatory hearing, it was in the best interests of the minors, and the court approved the waiver. Although the record on appeal does not contain the execution of that waiver in open court, respondent concedes that the express waiver was, in fact, entered that day.

¶ 17    The next status hearing occurred via video conference on December 7, 2022. At that hearing, the State presented the certified DNA test report indicating that there was a 0% probability that D.M. was the father of Ky. M. The State asked the court to make a finding that D.M. was not Ky. M.'s father, which the court entered. The court also granted the State's request for leave to publish to unknown fathers and all whom it may concern for Ky. M.

---

[2]The meaning of the acronym UCAN is not contained in the record, so we will refer to it as it as shown in the record for consistency.

¶ 18    Additionally, Cole testified that the minors were placed together in a traditional foster home. The placement was safe and appropriate. The minors were up to date on health appointments, except a dental appointment scheduled in the new year. The minors were involved in all recommended services. Respondent was visiting the children via Zoom twice a week.

¶ 19    On February 1, 2023, the court conducted the adjudicatory hearing via video conference. At the start of the hearing, the State presented an exhibit of the publication regarding Ky. M.'s paternity, which ran in the *Chicago Tribune* on December 14, 2022. The court found that, since no one appeared as the putative father for Ky. M., the State's motion for a default order regarding Ky. M. was granted.

¶ 20    The State called two witnesses at the adjudicatory hearing. Karla Robertson was assigned as the DCFS investigator in May 2022. As previously discussed in her affidavit above, she stated that the case came to the attention of DCFS on May 16, 2022, when respondent brought Kh. M. to Elmhurst Hospital. She was investigating allegations of inadequate food, medical neglect, malnutrition, and substantial risk. She spoke with respondent in the afternoon of May 17, 2022. She identified herself to respondent and informed respondent that Rodriguez would meet her at the hospital that day. Respondent indicated that she was not coming until she picked up Ky. M. from her mother, but Robertson explained that Ky. M. was in a safety plan and respondent was not going to be able to get Ky. M. that day. Respondent kept telling Robertson that her daughter was being kidnapped, but Robertson repeated that Ky. M. was safe. Robertson continued to tell respondent that they should meet at the hospital to discuss Kh. M., but respondent was unwilling to come to the hospital until she got Ky. M. Respondent eventually hung up on Robertson. Robertson attempted to call respondent back, but respondent did not answer.

¶ 21    The next day, on May 18, 2022, Robertson met with social worker Paige Larson. Larson

called respondent, and Robertson told respondent she was waiting for respondent at the hospital to meet with her. Respondent said that she was not coming to the hospital and instead she was sitting in front of her mother's house to get Ky. M. and had been there since 4 a.m. Robertson again informed respondent that Ky. M. was in a safety plan with the grandmother and respondent would not be able to get her daughter. Robertson told respondent that she should come to the hospital to discuss her son Kh. M. Respondent again said that she was not coming to the hospital because her mother had kidnapped Ky. M. and respondent would not come to the hospital until she got Ky. M. back. Robertson again was unable to discuss Kh. M.'s medical condition with respondent. Respondent did not appear to understand that Ky. M. was in a safety plan. Robertson was unable to set up a time to meet with respondent.

¶ 22     At approximately 5 p.m. on May 19, 2022, respondent called Robertson. Respondent told her that she did not have Ky. M., she was unable to get in touch with her mother, and she waited in front of her mother's house for 12 hours the previous day. She continued to assert that her mother had kidnapped her daughter. Robertson reiterated that Ky. M. was safe and in a safety plan, but she needed to speak with respondent about Kh. M., who was "very sick." Robertson was again unable to set up a meeting with respondent.

¶ 23     During this phone call, respondent told Robertson that her mother was a pedophile who was sexually attracted to respondent and had watched as respondent had been raped as a child. Robertson asked respondent why she thought that her mother had this sexual attraction, and respondent answered that she had a recording and she heard it in her mother's voice on the recording and that her mother may have raped her as a child. Robertson testified that respondent "couldn't remember if her mother had raped her, but that she wouldn't put it past her mother. That she had probably raped her as a child."

¶ 24    Robertson testified that part of the DCFS safety plan for Ky. M. was to run a background check on the maternal grandmother. If there were any concerns, then DCFS would not place the child. Ky. M. continued to stay with the maternal grandmother during the investigation.

¶ 25    Robertson then told respondent she was waiting to hear from the child abuse doctors at Loyola and would contact respondent with their finding. Respondent had not asked about how Kh. M. was doing in any of the three conversations. Robertson received information regarding Kh. M.'s diagnosis on May 23, 2022. She met with respondent at Loyola on May 24, 2022.

¶ 26    During the meeting, Robertson tried to read the hotline narrative to respondent, but respondent kept interrupting and telling her there was no hotline call. Robertson was unable to have a productive conversation with respondent. She told respondent that protective custody had been taken due to the findings of the child abuse team at Loyola. Based on information from Loyola, DCFS took protective custody of the minors because the minors would be "at imminent risk of harm if they remained in the care of their mom, the natural mother [respondent]." The case was indicated for inadequate food, medical neglect, malnutrition, and risk of harm.

¶ 27    Maribel Rodriguez testified that she was employed as a DCFS investigator when she was assigned this case on May 17, 2022. She spoke with respondent on the telephone to determine if respondent had someone to care for Ky. M. during the DCFS investigation. Kh. M. was hospitalized at Loyola University Medical Center (Loyola) at that time. Respondent identified the maternal grandmother as the placement for Ky. M.

¶ 28    Later that day, Rodriguez observed Kh. M. at Loyola. She described his appearance as "very fragile and thin" and he "seemed to be in some sort of pain." She could see his rib cage. Rodriguez took photographs of Kh. M., and the State presented those photographs as exhibits, which the court admitted. A primary investigator was subsequently assigned, and Rodriguez did

not have any further involvement in this case.

¶ 29    Following arguments, the court found the minors to be neglected due to lack of care, neglected due to injurious environment, and abused due to substantial risk of injury as defined in the Juvenile Court Act. See 705 ILCS 405/2-3 (West 2020). The court found that the abuse and neglect were inflicted by respondent. The court, in its findings, acknowledged the photos, the medical records, the descriptions of the children's conditions when DCFS intervened, the obvious lack of appropriate care, and lack of attention to their mental and developmental needs by the parent.

¶ 30    The court then proceeded to the dispositional hearing. Rolanda Collins testified that she was the assigned child protection specialist from May until October 2022. Collins recounted the visit in July 2022 when respondent abducted Ky. M. from the DCFS facility. After this incident, DCFS determined that video visitation was most appropriate. The case was later transferred to a specialized agency, UCAN.

¶ 31    Jeffrey Brown testified that he was a supervisor at UCAN and was the supervisor to the minors' case following the transfer from DCFS. UCAN was still servicing the case. Both minors are in the same placement. It is a nonrelative, specialized placement. Ky. M. was placed in this foster home in September 2022, and Kh. M. was placed in the home in October 2022. Brown's most recent visit to the foster home was January 27, 2023. The home was safe and appropriate with no signs or reports of abuse or neglect or corporal punishment. He did not have any unusual incidents to report for either child.

¶ 32    Brown testified that Kh. M. had a gastronomy tube (g-tube) placed near his abdomen for feeding. He has an oral aversion and developmental delays. He received occupational therapy. Kh. M. was nonverbal, had an individualized education plan (IEP), and was on the waiting list

for speech therapy. He was up to date medically, but the results of his hearing and vision were inconclusive, and Brown needed to talk to the foster parent about the follow up appointment.

¶ 33    Ky. M. also had an IEP, and Brown was waiting to see what was recommended for her. The ophthalmologist was concerned that one of her visual areas looked a little weak. As of the hearing, Ky. M. did not need any services. Ky. M. was more social and talking more every time Brown visited. Kh. M. tended to play by himself. Brown found the specialized placement was meeting all of the minors' medical, social, and emotional needs. The foster parents were willing to provide permanency if necessary.

¶ 34    Respondent was in therapy with UCAN. Brown did not have a mental health assessment or treatment plan for respondent yet. Respondent had been receiving video visitation with the minors because respondent was on electronic monitoring based on the abduction of Ky. M. in July 2022. UCAN continued to recommend virtual visits with respondent. UCAN recommended that both minors be adjudged wards of the court, and this would be in the best interest of the minors.

¶ 35    At the conclusion of the hearing, the court adjudged Kh. M. and Ky. M. to be wards of the court, stating that it was in the best interest of the children. The court further found respondent unable, for reasons other than financial circumstances alone, to care for, protect, train, or discipline the minors. The court also found the minors' father, who remains unknown, to be unable and unwilling to provide such care. The court found that reasonable efforts to prevent or eliminate the need for removal of the children had been made and that appropriate services aimed at reunification had not been successful as of the date of the disposition. Additionally, the court found respondent to be the perpetrator of the abuse and neglect in its ruling and that the children would continue in DCFS care and custody while respondent worked on reunification

services. The order for temporary custody was vacated, and the court placed the children in the custody of the DCFS guardianship administrator. The court entered a goal of returning home within 12 months.

¶ 36    This appeal follows.

¶ 37    The Juvenile Court Act provides a two-step process the trial court must utilize to decide whether a minor child should become a ward of the court. *In re A.P.*, 2012 IL 113875, ¶ 18. The first step of the process is the adjudicatory hearing, at which the court considers only whether the minor child is abused, neglected, or dependent. *Id.* ¶ 19; see 705 ILCS 405/2-18(1) (West 2020). If the circuit court determines the minor child is abused, neglected, or dependent at the adjudicatory hearing, then the court holds a dispositional hearing, in which the court determines whether it is consistent with the health, safety, and best interests of the minor child and the public for the minor child to be made a ward of the court. *A.P.*, 2012 IL 113875, ¶ 21; see 705 ILCS 405/2-22 (West 2020). In any proceeding brought under the Juvenile Court Act, including an adjudication of wardship, the paramount consideration is the best interest of the child. *A.P.*, 2012 IL 113875, ¶ 18.

¶ 38    Section 2-14(b) of the Juvenile Court Act, which is at the center of this appeal, provides: "When a petition is filed alleging that the minor is abused, neglected or dependent, an adjudicatory hearing shall be commenced within 90 days of the date of service of process upon the minor, parents, any guardian and any legal custodian ***." 705 ILCS 405/2-14(b) (West 2020). The statute further provides, "[i]f the adjudicatory hearing is not heard within the time limits required by subsection (b) or (c) of this Section, upon motion by any party the petition shall be dismissed without prejudice." *Id.* § 2-14(c). The supreme court has found that "the legislature intended a mandatory construction of section 2-14." *In re S.G.*, 175 Ill. 2d 471, 482

13

(1997). The supreme court has concluded that, since section 2-14 begins to run on the date of the service of process, the date a default is entered against an absent parent is the starting point of the 90-day statutory time period. *Id.* at 483; see *In re V.Z.*, 287 Ill. App. 3d 552, 559 (1997) (recognizing *S.G.*'s holding and finding the 90-day period began after the minor's father had been defaulted following service by publication). Under section 2-14(d), the time limits may be waived by the consent of all parties and approved by the trial court, which respondent has conceded occurred on October 19, 2022. 705 ILCS 405/2-14(d) (West 2020).

¶ 39    In enacting the Juvenile Court Act, the legislature recognized that serious delay in the adjudication of abuse, neglect, or dependency cases can cause harm to the minor and his or her family and that delay can frustrate "the health, safety and best interests of the minor and the effort to establish permanent homes for children in need." *Id.* § 2-14(a). The purpose of section 2-14 and the intent of the Juvenile Court Act is to insure that the State of Illinois

> "will act in a just and speedy manner to determine the best interests of the minor, including providing for the safety of the minor, identifying families in need, reunifying families where the minor can be cared for at home without endangering the minor's health or safety and it is in the best interests of the minor, and, if reunification is not consistent with the health, safety and best interests of the minor, finding another permanent home for the minor." *Id.*

¶ 40    Respondent does not challenge the trial court's findings that the minors were abused and neglected and that it was in their best interest to be made wards of the court. Rather, respondent solely argues on appeal that her trial counsel was ineffective for affirmatively waiving the statutory 90-day time period in which to conduct the adjudication hearing. More specifically, respondent contends that the 90-day time period had passed when her counsel agreed to the

waiver and instead counsel should have moved to dismiss the petition under section 2-14(c) of the Juvenile Court Act (*id.* § 2-14(c)). Continuing, respondent asserts that she was prejudiced because the dismissal order would have resulted in the adjudicatory and dispositional proceedings not having occurred and her children being returned home.

¶ 41    Although there is no constitutional right to counsel in proceedings pursuant to the Juvenile Court Act, a statutory right has been granted. *In re Charles W.*, 2014 IL App (1st) 131281, ¶ 32. Under the Juvenile Court Act, the parent of a minor who is the subject of proceedings has a statutory right to be represented by counsel, including the appointment of the public defender. 705 ILCS 405/1-5(1) (West 2020).

¶ 42    The right to effective assistance of counsel "flows from the gravity of the proceeding, which can result in the separation of a parent from a child, and the fact that abuse and neglect proceedings can often be a precursor to proceedings to terminate parental rights." *In re H.C.*, 2023 IL App (1st) 220881, ¶ 86. To establish a claim of ineffective assistance of counsel, the parent must show both that her counsel's representation fell below an objective standard of reasonableness and, but for the error, there is a reasonable probability that the outcome would have been different. *Charles W.*, 2014 IL App (1st) 131281, ¶ 32 (citing *In re S.G.*, 347 Ill. App. 3d 476, 479 (2004)). "Counsel's conduct is presumed to be the product of sound trial strategy, and respondent bears the burden of overcoming this presumption." *Id.* "We should indulge the strong presumption that [trial] counsel's conduct falls within a wide range of reasonable professional conduct ***." *H.C.*, 2023 IL App (1st) 220881, ¶ 87. Both prongs of the *Strickland* test must be satisfied for respondent to succeed on a claim of ineffective assistance of counsel. *In re K.O.*, 336 Ill. App. 3d 98, 111 (2002); see *Strickland v. Washington*, 466 U.S. 668 (1984). We review claims of ineffective assistance of counsel *de novo*. *H.C.*, 2023 IL App (1st) 220881,

¶ 87.

¶ 43    The public guardian and the State first contend that respondent forfeited her claim related to the timeliness of the adjudicatory hearing by failing to object in the trial court. See *In re John Paul J.*, 343 Ill. App. 3d 865, 878 (2003) (finding "the respondents have waived any objection as to the timeliness of the adjudicatory hearing by failing to move for dismissal of the petition for adjudication of wardship on this basis"). However, unlike in *John Paul J.*, respondent has based her argument regarding the timeliness on her counsel's ineffectiveness. Since she has specifically argued that her counsel was ineffective for failing to move for a dismissal, she has not forfeited this claim. See *People v. Lawton*, 212 Ill. 2d 285, 296 (2004) ("An attorney cannot be expected to argue his own ineffectiveness. That is why, for example, trial counsel's failure to assert his own ineffective representation in a posttrial motion does not waive the issue on appeal."). Thus, we first determine whether the 90-day time period had passed prior to the entry of the waiver order.

¶ 44    We begin with an outline of the events leading up to the adjudicatory hearing in this case. On May 26, 2022, respondent was served with process when she appeared in court. She named D.M. as the father of the minors. D.M. was subsequently served on June 6, 2022, when he appeared for the court hearing conducted via video conference. D.M. resided out of state in Nevada. At that proceeding, D.M. testified that he was the father of the minors, but he was unsure if he was named on the minors' birth certificates, he had never claimed paternity, and he was not paying child support. At that hearing, the State asked for an order for DNA testing for the minors and D.M., which the court deferred to the next status hearing.

¶ 45    One week later, at the next hearing on June 13, 2022, the Public Guardian requested a DNA test for both children and D.M. The court ordered the DNA test over D.M.'s objection.

Contrary to respondent's contention and although D.M.'s attorney objected to the testing, D.M. did not refuse to submit to DNA testing. At the August 25, 2022, hearing, the prosecutor indicated that D.M. missed a scheduled DNA test in July. His counsel contacted the prosecutor and informed her that D.M. wanted to reschedule his test. The prosecutor stated that D.M. was supposed to submit to a test on August 24, 2022, but did not yet know if D.M. had appeared at the appointment. The court observed that neither of the minors had been taken for DNA testing. The court stated that it would postpone the paternity issue and see if the testing could occur by the next court date.

¶ 46     The record indicates D.M. appeared for his DNA test on September 14, 2022. At the September 21, 2022, status hearing, the State informed the court that only Kh. M. had been tested. The DNA results for Kh. M. indicated a 0% probability that D.M. was Kh. M.'s father. Respondent was unable to name any other potential father for the minor. The State then asked the court for leave to publish to unknown parties and all whom it may concern regarding Kh. M.'s putative father, which the court granted.

¶ 47     At the October 19, 2022, status hearing, the State informed the court that service by publication regarding Kh. M. occurred on September 26, 2022. The court observed that no one had appeared following the publication in court or for the video hearing and then entered a default order for the father of Kh. M. The counsel for DCFS informed the court that the UCAN caseworker would be taking Ky. M. to be tested the following day. Further, as already pointed out above, the order effectively waiving the adjudication time frame was entered on October 19, 2022, as conceded by respondent.

¶ 48     At the next status hearing on December 7, 2022, the State presented the certified DNA test report indicating that there was a 0% probability that D.M. was the father of Ky. M. The

State asked the court to make a finding that D.M. was not Ky. M.'s father, which the court entered. The court also granted the State's request for leave to publish to unknown fathers and all whom it may concern for Ky. M.

¶ 49    At the start of the February 1, 2023, hearing, the State informed the court that service by publication regarding Ky. M. ran in the *Chicago Tribune* on December 14, 2022. The court held that, since no one appeared as the putative father for Ky. M., a default order was entered for Ky. M.'s father. The court then proceeded with the adjudication hearing.

¶ 50    As illustrated above, the primary reason for the delay in conducting the adjudicatory hearing was to determine the minors' father(s) and provide service to him/them with the requisite notice. From the start of the proceedings, it was respondent who identified D.M. as the father. When DNA testing determined that he was not the father for either Kh. M. or Ky. M., respondent was unable to provide a name for another putative father. Without that information, the State was required to effectuate service by publication. The adjudicatory hearing was conducted after the service was completed for Ky. M.'s putative father with time for an individual to appear. Absent service by publication, the trial court could not enter any order or judgment against the unknown putative father(s). 705 ILCS 405/2-16(2) (West 2020) ("the court may not enter any order or judgment against any person who cannot be served with process other than by publication unless notice by publication is given"). While not acknowledging her own role, we find respondent's conduct caused virtually all of the delays in these proceedings, including her initial naming of D.M. as the father of the minors, her failure to supply the name of any possible putative father(s) for the minors after DNA revealed D.M. was not the father of either minor, her kidnapping of Ky. M., her subsequent incarceration, her placement on electronic monitoring, and her failure to complete the therapy services ordered by the court. See *In re Jackson*, 243 Ill. App. 3d 631, 647-

48 (1993) (finding that the appellant mother could not complain of delays she occasioned in setting the adjudicatory hearing).

¶ 51    As discussed above, the time period under section 2-14 begins to run when all parents have been served. Respondent contends that D.M. did not want to submit to DNA testing and his delay in appearing for the test should not toll the time period. According to respondent, the service by publication for the unknown fathers should have been initiated when D.M. failed to timely submit to DNA testing. However, respondent fails to cite any relevant authority suggesting that service by publication should be ordered when a putative father causes a delay in DNA testing. Illinois Supreme Court Rule 341(h)(7) (eff. July 1, 2008) requires appellant's brief to include an "[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on."

¶ 52    Moreover, D.M. appeared in the proceedings and asserted that he was the father of the minors. And again, contrary to respondent's contention, D.M. did not refuse to submit to the DNA testing. Additionally, had he been found to be the minors' father, any service by publication would have been unnecessary. Respondent's argument minimizing the determination of the father(s) fails to consider the best interest of the minors, which includes the minors' familial ties and their need for permanence, including the "need for stability and continuity of relationships with parent figures." See 705 ILCS 405/1-3(4.05)(c), (g) (West 2020). Resolving the question of paternity as to D.M. was in the best interest of the children.

> "It is clear the legislature intended, not slavish adherence to an arbitrarily fixed period of time, but concern for the overall purpose of the Juvenile Court Act. It should not be forgotten that the statute's statement of purpose and policy itself, section 2-14(a), speaks not just in terms of speedy adjudication but 'just and

speedy' adjudication." *In re D.E.*, 314 Ill. App. 3d 764, 770 (2000).

While respondent focuses on the Juvenile Court Act's intent for a speedy proceeding, she fails to recognize that the statute provides for acting in a "just and speedy manner to determine the best interests of the minor." See 705 ILCS 405/2-14(a) (West 2020). Respondent's argument that service by publication should have occurred before D.M. was eliminated as the father does not comport with the intent for a "just and speedy" adjudication in the best interest of the minors. Respondent has not shown that any of the delays would have allowed for the adjudicatory hearing to be held prior to service by publication for the unknown fathers.

¶ 53    As previously noted, the date a default is entered against an absent parent is the start of the 90-day statutory time period under section 2-14. See *S.G.*, 175 Ill. 2d at 483. Here, the default order for the father of Kh. M. was entered on October 19, 2022, and the order for the father of Ky. M. on February 1, 2023. Because the possibility existed that the twins could have either the same or different fathers, the DNA testing for both minors was required. Thus, the 90-day period did not begin until February 1, 2023, after the final service of process occurred. Since the adjudicatory hearing was conducted on February 1, 2023, the hearing was timely, and the trial court proceedings complied with section 2-14. Because the adjudicatory hearing complied with section 2-14(b)'s time period, respondent's trial counsel could not have been ineffective for failing to file a futile motion to dismiss the petitions for adjudication of wardship. *People v. Givens*, 237 Ill. 2d 311, 331 (2010) (where the supreme court held that the failure to file a motion which would not be successful and thus the outcome of the trial would not have been different does not establish incompetent representation).

¶ 54    In her reply brief, respondent asserts for the first time that the service by publication was unnecessary because, under section 2-16(2), notice by publication is not required when the

person with legal custody of the minors has been served. 705 ILCS 405/2-16(2) (West 2020). According to respondent, the court was not required to provide notice by publication to the unnamed father(s) of the minors, and the adjudicatory hearing should have been held earlier. However, respondent did not raise this argument in her opening brief. Her only reference to section 2-16 was part of her contention that the adjudicatory hearing could have been held within 90 days while still complying with the service requirements under the Juvenile Court Act. She noted that section 2-16 related to "governing notice by certified mail or publication." Under Rule 341(h)(7), "[p]oints not argued are forfeited and shall not be raised in the reply brief." Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008). Since respondent did not assert this argument regarding the notice by publication requirements under section 2-16 in her opening brief, this argument has been forfeited.

¶ 55    Forfeiture aside, respondent fails to acknowledge that the second part of the sentence from section 2-16(2), which provides:

> "Notice by publication is not required in any case when the person alleged to have legal custody of the minor has been served with summons personally or by certified mail, but the court may not enter any order or judgment against any person who cannot be served with process other than by publication unless notice by publication is given or unless that person appears." 705 ILCS 405/2-16(2) (West 2020).

¶ 56    Without serving the unknown putative father(s) by publication, any order regarding the minors' adjudication or disposition could not be entered, and the court could not consider all parents in the same proceeding. "Providing effective service is a means of protecting an individual's right to due process by allowing for proper notification of interested individuals and

21

an opportunity to be heard." *In re J.B.*, 2018 IL App (1st) 173096, ¶ 32 (citing *In re Dar. C.*, 2011 IL 111083, ¶ 61). A parent is entitled to notice of a petition filed under the Juvenile Court Act. *Id.* (citing 705 ILCS 405/2-15 (West 2014)). "[I]f the trial court does not obtain personal jurisdiction over a litigant, the court is 'deprived of the authority or power to impose judgment against the litigant.' " *In re C.K.*, 2023 IL App (5th) 230012, ¶ 35 (quoting *Dar. C.*, 2011 IL 111083, ¶ 60, citing *In re M.W.*, 232 Ill. 2d 408, 428 (2009)).

¶ 57     Additionally, the best interest of the child includes the child's "need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives." 705 ILCS 405/1-3(4.05)(g) (West 2020). Absent an order against the unknown fathers, the minors' interest in permanence would not be advanced. "[T]he children's best interests trump even the parents' rights or interests in their children." *In re Custody of H.J.*, 2021 IL App (4th) 200401, ¶ 27. Here, the court acted in the best interest of the minors to resolve the service of any unknown father and enter any orders against all parents.

¶ 58     Finally, respondent's ineffective assistance claim also fails because she cannot satisfy both prongs of *Strickland*. See *K.O.*, 336 Ill. App. 3d at 111. Assuming *arguendo* that we were to conclude that respondent's counsel was deficient for failing to file a motion to dismiss, which we do not find, respondent cannot establish the requisite prejudice to support her claim of ineffective assistance. She asserts that she was prejudiced because, if the petition had been dismissed, then the court would not have entered findings of neglect or adjudicated the minors wards of the court.

¶ 59     However, any dismissal of the petitions would have been without prejudice. As the supreme court has recognized, "section 2-14 provides that the dismissal of a petition on timeliness grounds is *without prejudice*. 705 ILCS 405/2-14(c) (West 1994). Therefore, the State

may *immediately* file a new petition where children may be put at risk." (Emphases added.) *S.G.*, 175 Ill. 2d at 492.

> "[A]s our supreme court observed in *S.G.*, when a petition for adjudication of wardship is dismissed without prejudice on the basis that an adjudicatory hearing was not completed within the requisite time period, the State has the right to immediately file a new petition. The State may file the new petition against the same parties and base it on the same charges as those stated in the original petition." *In re Tiona W.*, 341 Ill. App. 3d 615, 620 (2003).

¶ 60 If the petitions had been dismissed without prejudice, the State would have undoubtably filed new petitions immediately thereafter, given the abuse and neglect suffered by the minors. Respondent attempts to minimize the risk of new petitions because the allegations would have to reflect the current situation at the time of filing. While the petitions would have been updated, the significant allegations of neglect that brought the case to DCFS would have been presented, including the evidence admitted at the adjudicatory hearing.

¶ 61 The medical and DCFS records included in the record detail the severity of the neglect for both minors under respondent's care. Respondent had failed to take the minors for routine medical care, and they had not been seen by a doctor since they were nine months old because she believed the minors were up to date. Kh. M. was hospitalized in the pediatric intensive care unit followed by rehabilitation following his diagnosis of malnourishment due to starvation, severe dehydration, and renal failure. Kh. M.'s condition "could have resulted in seizures, brain edema, complete kidney failure, shock, coma, or death." There was no organic cause for Kh. M.'s malnutrition; it was "medical neglect."

¶ 62 Kh. M.'s weight at admission to Loyola was 16 pounds and 13.5 ounces and was

"severely under [the] growth curve." Kh. M. had a severe oral aversion and "severe mixed expressive-receptive delay." Kh. M. also had a developmental delay, as well as impairments in "range of motion, strength, gross motor coordination, fine motor coordination, bilateral coordination, activity tolerance, visual perceptual skills, visual motor skills, motor planning, manual dexterity self-help skills." Kh. M. was not walking, talking, or sitting up on his own at 34 months old. He was developmentally "like a six-month-old child." Kh. M. had a bald spot on the back of his head from lying down. Respondent told a doctor at Loyola that Ky. M. would "help" her brother by sitting "behind him to help him stay up." Following his hospitalization at Loyola, he was admitted to Shriners Children's Hospital for rehabilitative services. He later was given a g-tube for feeding.

¶ 63    Ky. M. also had developmental delays in "communication, gross motor, fine motor, problem solving, and personal-social skills." A doctor at Loyola observed in her notes that Ky. M. was seen picking and eating her hair. As detailed above, while the case was pending, respondent abducted Ky. M. from a DCFS facility and kicked Collins, the caseworker supervising the visit. An Amber alert was issued for Ky. M., who was later found safe with respondent. Respondent was subsequently charged with multiple felonies for these actions, and from the record, these charges had not yet been resolved.

¶ 64    In finding that it was in the best interest of the minors to remove them from respondent's care, the court found that "reasonable efforts have been made to prevent or eliminate the need for removal of the minors from the home, and that appropriate services aimed at family preservation and family reunification have been unsuccessful at this time." Respondent did not present any evidence at the adjudicatory or dispositional hearings showing that she had made any progress in the services provided by DCFS.

¶ 65    Given this overwhelming evidence of medical neglect, respondent cannot establish the requisite prejudice. If the petitions had been dismissed without prejudice, not only would the State have been permitted to immediately refile with the same supporting evidence, it is clear that the juvenile court would have entered the same adjudicatory and dispositional orders. The purpose and policy of the Juvenile Court Act is to ensure the best interests and safety of the child. *In re Arthur H.*, 212 Ill. 2d 441, 467 (2004) (citing 705 ILCS 405/1-2 (West 2000)). It would not be in the best interest of the minors to have the petitions dismissed and be returned to respondent's care without addressing the reason the case was referred to DCFS, including the recommended services for both the minors and respondent. Since respondent cannot show a reasonable probability that the result would have been different, the claim of ineffective assistance of trial counsel lacks merit.

¶ 66    Based on the foregoing reasons, we affirm the decision of the circuit court of Cook County.

¶ 67    Affirmed.

---

## *In re Kh. M.*, 2023 IL App (1st) 230261

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, Nos. 22-JA-392, 22-JA-393; the Hon. Maxwell Griffin Jr., Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Sharone R. Mitchell Jr., Public Defender, of Chicago (Ross K. Holberg, Assistant Public Defender, of counsel), for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Gina DiVito, and Victoria L. Kennedy, Assistant State's Attorneys, of counsel), for the People. |
| | Charles P. Golbert, Public Guardian, of Chicago (Kass A. Plain and Mary Brigid Hayes, of counsel), for appellees. |